UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
J. KENNETH KEARNEY USA LTD.,           )
                                                    )
                        Plaintiff,                    )
                                                    )
v.                                                   )          Civil Action No. 04 CV 12643 RCL
                                                    )
                                                    )
DAVID SMITH,                                  )
                                                    )
                        Defendant.                 )
                                                    )
_____)

## DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION TO STAY LITIGATION

Defendant David Smith ("Smith"), by his attorneys Edwards & Angell, LLP, hereby moves this court to stay this litigation (the "Massachusetts Litigation") pending resolution of closely related litigation which has been pending in the United States District Court for the Southern District of Alabama for over one year (the "Alabama Litigation").

### Introduction

Plaintiff J. Kenneth Kearney USA Ltd. ("JKK") has concocted these claims against Smith, individually, which arise out of a sales and marketing agreement (the "S&M Agreement")(**Exhibit A**) entered into between JKK and Smith's business, Hartge Smith Nonwovens, LLC ("HSN"), solely in an attempt to circumvent the alternative dispute resolution, choice of law and forum selection provisions (¶10) of the S&M Agreement ("Dispute Resolution Provisions"), *which require the parties to submit to non-binding mediation, and thereafter to submit to the exclusive jurisdiction of the courts in Mobile,*

*Alabama for adjudication of the dispute if mediation fails*.  JKK will undoubtedly claim that since Smith, individually, is not a party to the S&M Agreement, it should be free to proceed against him in Massachusetts.  However, as set forth below, JKK's Complaint against Smith is nothing more than a transparent attempt by JKK to extort a monetary settlement from Smith in the Alabama Litigation.  Indeed, the parties to the Alabama Litigation, after having submitted to binding mediation, reached a settlement pending receipt of a release from JKK.  JKK refused to sign the release and instead sued Smith individually here in an ill-contrived attempt to extract a monetary payment from Smith and his company.  JKK has recently been added as a party/defendant to the Alabama Litigation. It is also closely aligned with another defendant to the Alabama Litigation, Nonwovens Industries SpA.  ("NWI SpA").  Moreover, the only reason JKK sued Smith individually here – and not his company, the signatory to the S&M Agreement – was to sidestep the venue provisions requiring that the parties submit to the exclusive jurisdiction of courts of Alabama.  Finally, the Massachusetts Litigation should be stayed since the claims asserted against Smith are utterly frivolous.

### Background

This case arises out of a business dispute among: JKK;  J. Kenneth Kearney and Paul Miller (principals of JKK); NWI SpA, an Italian company with whom JKK has had a long-standing business relationship (Complaint, ¶ 2; Affidavit of David Smith ("Smith Affidavit"), ¶ 11)); and Nonwovens Industries (USA), LLC, ("NWI USA"), an Alabama limited liability company of which Smith is the Managing Director, Secretary, Treasurer and Chief Financial Officer.  A related dispute between NWI SpA and NWI USA is currently being litigated in the United States District Court for the Southern District of Alabama, Civil Action No. 03-0840-

MJ-C ("Alabama Litigation") arising from NWI SpA's failure to capitalize NWI USA, as it was contractually obligated to do.  JKK has recently been added as a defendant to the Alabama Litigation.

Solely in an effort to extract a monetary payment in exchange for a release in the Alabama Litigation, JKK brought this suit in Massachusetts against Smith individually.  The only reason Smith was sued individually (rather than in his capacity as a manager and officer of NWI USA) was to try to avoid the Dispute Resolution Provisions of the S&M Agreement, which require the parties to submit to the exclusive jurisdiction of Alabama.

Despite the fact that JKK's Complaint is leveled against Smith, individually, JKK's Complaint repeatedly references the business dealings of NWI SpA and NWI USA, including the agreement between NWI SpA and Hartge Smith Nonwovens, L.L.C. ("HSN") of which Smith is a principal, by which NWI SpA and HSN agreed to operate the joint venture known as NWI USA ("JV Agreement") (Complaint, ¶¶ 7-10, 17-19).  JKK is not a party to the JV Agreement (**Exhibit B**), but the S&M Agreement (of which JKK is a party) references the JV Agreement between NWI SpA and NWI USA.

Similarly, JKK's Complaint repeatedly refers to the S&M Agreement among NWI SpA, NWI USA and JKK, as well as the alleged representations made by Smith to secure JKK's allegedly "confidential information" in connection with JKK's sales and marketing services for NWI USA.  (Complaint, ¶¶ 14-16, 29-46).  Specifically, JKK alleges that "[b]y virtue of [Smith and JKK's] relationship and [the S&M] Agreement, Smith was given access to and now possess, confidential information belonging to [JKK]." (Complaint, ¶¶ 30, 37).

BOS_472254_2.DOC/WROSEBUSH

Despite JKK's allegations concerning Smith's misappropriation of its alleged confidential information, JKK nowhere alleges -- nor can it -- that Smith signed a nondisclosure or confidentiality agreement with JKK. (Complaint, generally).  In fact, Smith refused to sign any such agreement.  (Smith Affidavit, ¶ 12).  Furthermore, neither the S&M Agreement nor the JV Agreement, both drafted and revised by counsel for all parties, impose *any* confidentiality or nondisclosure restrictions on Smith or NWI USA.  Despite no such agreement, and despite the fact that JKK took no other steps to try to protect its allegedly confidential information, JKK went ahead and turned over its purportedly "confidential information" to Smith.  (Complaint, ¶¶ 30, 37; Smith Affidavit, ¶¶ 8, 12).

The fact that JKK turned this information over despite the lack of a confidentiality agreement is no surprise.  The information provided to Smith/NWI USA is nothing more than a list of client prospects, of which Smith and NWI USA were already aware.  (Smith Affidavit, ¶¶ 5-8, Exhibits A and B).  In fact, at the time Smith's Company, HSN, purchased the equipment to make nonwoven fabric ("Equipment"), it was provided with the list of these customers by the seller both before and during the asset acquisition, well over a year *before* JKK, NWI USA and NWI SpA entered into the S&M Agreement. (Smith Affidavit, ¶ 5; Exhibit A to Smith Affidavit; and S&M Agreement).  Smith had contact with these customers before HSN/NWI USA became involved (JKK) and continues to be in contact with these customers without JKK's assistance.  (Smith Affidavit, ¶ 6).

Furthermore, this potential customer information is also generally known in the spunbond industry; it is in no way proprietary to JKK.  (Smith Affidavit, ¶ 7).  In fact, in the Alabama Litigation, NWI SpA (JKK's partner) entered much, if not all, of JKK's allegedly

confidential information into the court file without seeking any kind of protective order, thereby making it public information.  (Smith Affidavit, ¶ 15).

In stark contrast to the lack of a Non Disclosure/Confidentiality Agreement, both the S&M Agreement and the JV Agreement do contain explicit dispute resolution provisions. They state that any suit "arising from" (S&M Agreement) or "relating to" (JV Agreement) the Agreements that cannot be resolved by good faith negotiations between the parties *shall* be submitted to non-binding mediation in Mobile, Alabama (S&M Agreement, ¶10; JV Agreement, ¶ 13) (emphasis added).   Alternatively, if resolution of the dispute cannot be achieved by mediation, the parties agreed to:

> submit to the *exclusive* jurisdiction of the courts in Mobile, Alabama for adjudication of the dispute.

(S&M Agreement, ¶10; JV Agreement, ¶ 13) (emphasis added).  JKK has not engaged in any good faith negotiations to resolve the dispute with Smith, which "arises from" the S&M Agreement.  In fact, JKK's refusal to execute a release in the Alabama Litigation is the reason the Alabama Litigation did not settle in May 2004.  At the mediation of the Alabama Litigation, Roberto Baroni ("Baroni"), NWI SpA's principle, indicated to NWI USA and Smith that NWI SpA (JKK's business partner) would have no problem securing a release from JKK (including a release of the S&M Agreement) to resolve the Alabama Litigation.  All parties to the mediation were aware that JKK's release was consideration for the settlement agreement. (Smith Affidavit, ¶ 17).  Despite the fact that HSN, NWI USA and NWI SpA entered a binding settlement agreement which was premised on the representation by Baroni that he could get JKK to sign the release, JKK refused to execute the settlement agreement.

<u>See</u> Settlement Agreement, attached as **Exhibit C**; Smith Affidavit, ¶ 19.  After JKK refused to sign the settlement agreement, JKK and its counsel, sought approximately $1.25 million from NWI USA in exchange for signing the release, which Baroni had previously stated he would be able to secure in exchange for settlement of the Alabama Litigation. (Smith Affidavit, ¶ 20).

Shortly thereafter, JKK threatened suit against NWI USA.  When NWI USA's counsel inquired about the basis of JKK's alleged damages claims, JKK's counsel indicated that it did not have to disclose that information; rather it simply demanded that NWI USA cut a check for $1.25 million.  At no time prior to the initiation of the Massachusetts Litigation did JKK state, or even suggest, that its target was anything other than NWI USA.  (Smith Affidavit, ¶ 20).  When NWI USA refused to pay, JKK commenced this action against Smith personally with the Middlesex Superior Court, which Smith then timely removed to this Court. (Smith Affidavit, ¶ 21).

JKK should not be permitted to extract a settlement from Smith in the Alabama Litigation and simultaneously avoid the Dispute Resolution Provisions of the S&M Agreement by bringing meritless claims against Smith individually in Massachusetts.  All of JKK's claims "arise from" the S&M Agreement and therefore the Dispute Resolution Provisions contained therein must be enforced.  For these reasons, Smith requests that this Court stay this litigation pending non-binding mediation in Mobile, Alabama of JKK's claims against Smith, as well as the resolution of the Alabama Litigation and a transfer of this case to the United States District Court for the Southern District of Alabama.

BOS_472254_2.DOC/WROSEBUSH

### ARGUMENT

**A.     The Standard This Court Should Apply For Determining Whether To Issue A Stay.**

        The court, in its sound discretion, may stay any case pending before it as an exercise of its inherent power to control its own docket. Bowlby v. Carter Mfg. Corp., 138 F. Supp. 2nd 182 (D. Mass. 2001). The power to stay an action derives from the inherent power of this court "to control the disposition of the cases on its docket with the economy of time and effort for itself, for counsel, and for litigants." Landis v. North Am. Co., 299 U.S. 248, 254-55 (1936); Taunton Gardens Co. v. Hills, 557 F.2d 877, 879 (1st Cir. 1977). In deciding whether to grant the stay, this Court must consider the public interest, the court's interest in efficient procedures, and the interest that justice will be served. Id. (citing Landis v. N. Am. Co., 299 U.S. 248, 254-55 (1936)). It is beyond purview that judicial economy will be served by issuing a stay in this case because: (1) there is a near identity of parties in the Alabama Litigation; (2) the issues presented in the Alabama Litigation are substantially similar to the issues presented in this case; (3) the Alabama Litigation has been pending for over one year whereas this case has just been filed; (4) this case was brought solely for the purpose of attempting to extract a monetary settlement in the Alabama Litigation and to side-step the venue and exclusive venue provisions in the parties' written agreement; and (5) the claims brought by JKK against Smith here are frivolous.

**B.    The Massachusetts Litigation Should Be Stayed Because It Was Commenced For Improper Motives And Closely Related Litigation Involving The Same Parties Has Been Pending In Alabama For Over A Year.**

**1.    The Court May Consider The Merits Of A Claim As Well As The "Vexatious And Reactive Nature" Of The Litigation In Issuing A Stay.**

While there is a presumption that federal courts will retain jurisdiction over cases presented to them, there are circumstances, including where litigation is "vexatious and reactive," in which federal courts should refuse to exercise jurisdiction over a claim. See e.g. Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 947 F.2d 529, 533 (1st Cir. 1991). Similarly, a stay of litigation is particularly appropriate where a parallel proceeding has been filed vexatiously or in order to harass or undermine matters that have been substantially resolved. See In re First Commodity Corp. of Boston, 89 B.R. 283, 287 (D.Mass. 1988). Furthermore, where related litigation is pending in different forums, the court may take action to prevent duplicative litigation, which is a waste of judicial resources. See Petricca v. FDIC, --- F.Supp.2d ---, 2004 WL 2181585, *2 (D.Mass. 2004)(dismissing without prejudice federal action which is duplicative of a state court action on the grounds that the federal litigation was intrusive and a waste of judicial resources); Davox Corp. v. Digital Systems International, Inc., 846 F.Supp.144, 149 (D.Mass. 1993)(transferring claims with substantially overlapping factual issues to a single forum).

Here, JKK has filed litigation in this Court that is both vexatious and reactive. JKK's motive for the suit -- to gain leverage and a financial settlement in the Alabama Litigation -- is improper.    There is already a binding settlement agreement in place in the Alabama

Litigation, which concerns JKK and which deals with substantially the same factual issues as the claims brought by JKK in this forum.  JKK has now been added as a named party to the Alabama Litigation, in part because of its breach of that Settlement Agreement.  As such, that litigation should be allowed to proceed to conclusion before JKK is permitted to proceed with claims against Smith individually in an attempt to undermine the Alabama Litigation.

Moreover, the lack of merit to JKK's claims should also be considered by the Court in issuing a stay.  Courts in Massachusetts have historically reviewed a case's merits in analyzing whether a stay will be granted in a variety of circumstances.  See Doe v. Israel, 482 F.2d 156, 159 (1973)(denying appellant's request for stay pending appeal where plaintiff-appellees' "expectation of prevailing on the merits" is "so clear" that stay is denied); Latino Political Action Committee, Inc. v. City of Boston, 716 F.2d 68, 69 (1st Cir. 1983)(denying stay pending appeal where appellant's likelihood of success is "too low to justify granting of the stay"); Carpenter v. Suffolk Franklin Savings Bank, 370 Mass. 314, 322 (1976)(stay of class action may be appropriate to see whether disposition of a test case may not settle the other claims and avoid useless expenses if the test case fails on the merits).  In addition, "it is within a district court's inherent power to order non-consensual mediation in those cases in which that step seems reasonably likely to serve the interests of justice." In re Atlantic Pipe Corp., 304 F.3d 135, 145 (2002).  In this case, the interests of justice are clearly met by issuing a stay ordering the parties to non-binding mediation in Mobile, Alabama, as expressly contemplated in the S&M Agreement.

Here JKK's claims, though plead in a variety of ways, are based upon one simple assertion:  Smith allegedly obtained and disclosed JKK's confidential information.  However,

BOS_472254_2.DOC/WROSEBUSH

JKK cannot point to one shred of evidence that the information at issue (client prospect lists) qualifies as confidential.  There was no confidentiality or nondisclosure agreement between Smith (or HSN) and JKK.  In fact, while JKK tried to get HSN to sign a confidentiality agreement, HSN refused to do so.  There exists no language whatsoever in any of the written agreements among the parties, including the S&M Agreement or the Joint Venture Agreement – in which all parties were represented by counsel – indicating that any of the parties had any confidentiality obligations to the other parties.  Indeed, Smith and HSN already had the allegedly "confidential" information as a result of the purchase of the Equipment well before JKK's involvement with NWI USA, and the information is publicly available.  In fact, this purportedly "confidential" information has already been made part of the public record in the Alabama Litigation.  NWI SpA, JKK's partner, made no attempt whatsoever to file these documents under seal.

Finally, the fact that JKK has chosen not to seek any kind of preliminary injunction relief here – in precisely the type of case that, under normal circumstances, beckons for just such relief – reveals the fact that JKK knows its claims simply have no legs.  The Massachusetts Litigation should be stayed.

**C.     The Dispute Resolution Provisions Of The Sales And Marketing Agreement Apply To JKK's Claims Against Smith.**

When JKK signed the S&M Agreement with NWI USA and NWI SpA, it agreed to resolve "any dispute arising from the subject matter" of the S&M Agreement by non-binding mediation in Mobile, Alabama.  All of JKK's claims arise from the subject matter of the S&M Agreement, namely the agreement that JKK would provide sales and marketing services to

BOS_472254_2.DOC/WROSEBUSH

NWI USA.  In particular, JKK expressly invokes the S&M Agreement as the reason that the allegedly confidential information was provided to Smith.  (Complaint, ¶¶ 30, 37).  However, while JKK discusses the S&M Agreement between JKK and NWI USA at length in its Complaint, it has filed suit solely against Smith, a manager and officer of NWI USA, in his individual capacity in an attempt to benefit from the S&M Agreement as the basis of its claims, while blatantly avoiding the Dispute Resolution Provisions of the Agreement.  JKK should not be permitted to do so.

Much like arbitration provisions, this Court has recognized and enforced the contractual obligations of parties to submit to mediation as a condition precedent to litigation or other legal proceedings.  See, HIM Portland, LLC v. DeVito Builders, Inc., 317 F.3d 41, 44 (1st Cir. 2003).  In HIM Portland, the First Circuit was presented with a contractual provision which stated that if the parties could not resolve their disputes by other means set forth in the contract, the claims were "subject to mediation *as a condition precedent to arbitration or the institution of legal or equitable proceedings* by either party." 317 F.3d at 42 (emphasis added).  At issue in the case was whether HIM Portland could demand arbitration where it had failed to request mediation of the claims. Id. at 44.  The Court found that "[u]nder the plain language of the contract, the arbitration provision of the agreement is not triggered until one of the parties requests mediation." Id.  Because neither party had attempted to mediate the dispute, which was a condition to arbitration (and litigation) according to the terms of the contract, neither party could be compelled to submit to arbitration. Id. See also Rolland v. Cellucci, 198 F.Supp.2d 25, 27 (D.Mass. 2002)(settlement agreement contained stay

BOS_472254_2.DOC/WROSEBUSH

provision requiring mediation of disputes pursuant to the settlement, and if mediation efforts were unsuccessful to file a motion for judicial determination).

Mediation is a condition precedent to litigation between the parties as set forth in plain language of the S&M Agreement.  (¶ 10).  JKK has not met the condition precedent because it has failed to mediate the case.  Therefore, it may not initiate suit against Smith, NWI USA's manager and officer, in order to circumvent the S&M Agreement upon which its suit relies. Furthermore, JKK cannot initiate suit here in Massachusetts.  Rather, if it has a legitimate dispute arising out of the S&M Agreement, it must submit to litigation in the Courts of Mobile, Alabama if the dispute is not resolved by mediation.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendant David Smith respectfully requests that this Court issue a stay of this litigation pending: 1) resolution of the Alabama Litigation; 2) submission of the parties to non-binding mediation in Mobile, Alabama if the resolution of the Alabama Litigation does not resolve the claims in JKK's Complaint; and 3) transfer of this case to the United States District Court for the Southern District of Alabama for all purposes if mediation of this case does not resolve the parties' dispute.

DAVID SMITH,

By his attorneys,


_/s/ Windy L. Rosebush_____
Timothy P. Van Dyck
Windy L. Rosebush
Edwards & Angell, LLP
101 Federal Street
Boston, MA  02110
617-439-4444

BOS_472254_2.DOC/WROSEBUSH

## **LOCAL RULE 7.1 CERTIFICATION**

On January 18 and 19, 2005, counsel for the Defendant conferred with counsel for the Plaintiff, in a good faith effort to resolve or narrow the issues presented by way of this motion.  Despite good faith efforts, counsel were unable to resolve or narrow the issues presented in this motion.

_/s/ Windy L. Rosebush_____
Windy L. Rosebush

## **CERTIFICATE OF SERVICE**

I, Windy L. Rosebush, hereby certify that on this 19th day of January, 2005, I caused a copy of the foregoing document to be served upon William A. Zucker, Esq. and Kristin M. Cataldo, Esq. of Gadsby Hannah LLP, 225 Franklin Street, 21st Floor, Boston, MA  02110 by filing the same electronically.

_/s/ Windy L. Rosebush_____
Windy L. Rosebush

# SALES AND MARKETING AGREEMENT

This Sales Support Agreement ("Agreement"), made effective the 17th day of September, 2003 ("Effective Date") by and between: **Nonwovens Industries (USA), L.L.C.** ("NWI-USA" and "Company"), a limited liability company organized under the laws of the State of Alabama; **Nonwovens Industries SpA**, a corporation organized under the laws of Italy ("NWI") and; **J. Kenneth Kearney USA Ltd.** ("JKK"), a corporation organized under the law of the State of New York. NWI-USA, NWI and JKK are collectively referred to in this Agreement as the "Parties".

Whereas, NWI is a leading manufacturer of Spunbond and possesses considerable skill and expertise in the technology inherent in the manufacture of Spunbond and the sale thereof, and;

Whereas, JKK is a sales and marketing company specializing in the sale of nonwoven fabrics with particular expertise in the sale and marketing of Spunbond and desires to provide its services to NWI-USA relating to such expertise, and;

Whereas, NWI-USA has been formed to manufacture and sell high quality polyester spunbond ("Spunbond") and desires to retain the services of J. Kenneth Kearney and Paul Miller, officers of JKK, to assist the Company in the sale and marketing of Spunbond and potentially other related products;

In consideration of the premises set forth in the Agreement, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.   **Structure and Ownership of NWI-USA.**

(a)  *Divisions*. NWI-USA shall be organized, managed and operated in accordance with the "Nonwovens Industries (USA), L.L.C. Operating Agreement" and, as applicable, the "Joint Venture Agreement" entered into between NWI-USA and NWI with an effective date of August 21, 2003, as both documents may be amended from time to time (collectively referred to as the "Extraneous Agreements"), with at least two divisions: (*i*) an Operations Division, responsible for the manufacture, research and development and general administration of the Company, and; (*ii*) a Trading Division, responsible for the sale and marketing of Spunbond and any related product or products manufactured or developed by the Company.

(b)  *Applicability of the Extraneous Documents*. The terms and conditions of the Extraneous Agreements, as both documents may be amended from time to time, shall govern the conduct, rights and privileges of the Parties relating to the matters contemplated by this Agreement in the event of any inconsistency between the terms and conditions of this Agreement and the Operating Agreement.

09/23/2004  16:11    26                    HANDARENDALL                        PAGE 04/35

(c)    *Books and Records of Divisions and Capital Accounts.*  The Company shall maintain appropriate books and records setting forth the profits and losses achieved or incurred by each division of the Company. Separate capital accounts shall also be maintained for each Member in accordance with generally accepted accounting principles and the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(d)    *Membership Interests.* Membership interests in NWI-USA shall be designated as Class A Units and Class B Units, with the rights and preferences set forth in this Agreement and the Members holding either class of units shall be designated as "Class A Members" and/or "Class B Members". Class A Members shall share in the profits and losses of the Operations Division in proportion with their ownership percentages. Class B Members shall share in the profits and losses of the Trading Division in proportion with their percentages of membership interests and without priority to any member.

(e)    *Voting Rights.*  Class A Members shall be entitled to one vote for each Class A Unit held by them at the time of a vote.  Class B Members shall not be entitled to any vote.

2.    **Members of NWI-USA.**  The following members have been, or will be admitted no later than October 5, 2003, to the Company, as set forth below, with the following membership interests:

| Member | Interest | Date Interests Vests |
|--------|----------|----------------------|
| HSN Group | 25% of Class A and 20% of Class B | August 22, 2003 |
| Nonwovens Group | 75% of Class A and 60% of Class B | No later than October 5, 2003 |
| JKK Group | 0% of Class A and 20% of Class B | At Effective Date |

3.    **Performance of Trading Division**

(a)    *Management of Trading Division.*  JKK shall provide the primary sales and marketing functions to NWI-USA by managing the performance of the Company's Trading Division, subject to the management oversight and responsibilities of the Company's board of directors and officers. JKK shall specifically be responsible for the development and implementation of marketing and sales strategies to maximize the sale of Spunbond and related products which may be developed by NWI-USA or NWI in current and potential markets in North America.

(b)    *Performance Objectives for the Trading Division.* The Parties shall negotiate annual performance objectives for the Trading Division in terms of the quantity, type of

Spunbond and profitability. The Trading Division shall use its best commercial efforts to achieve the performance objectives set forth at Attachment A to this Agreement.

(c)    *Markets*. The Trading Division will serve the existing market in North America developed by JKK and NWI inclusive of the Freudenberg business and all other current and potential customers that exist or will be developed in the future.

(d)    *Sales Assistance by NWI and NWI-USA*. NWI and NWI-USA shall assist the Trading Division in sales activities related to the sale of Spunbond including, but not limited to, complying with customers' specifications and special requirements, and to use their best efforts to develop new products for sale by the Trading Division.

(e)    *Profitability and Market Development*. The Parties will use their best commercial efforts to achieve profitable results for NWI-USA. Nothing in this Agreement shall, however, preclude NWI-USA or NWI from developing markets in those geographic territories and product areas in which JKK is not present, not interested or, in NWI-USA's judgment, that the Trading Division is unable to devote sufficient resources to develop without any involvement by the Trading Division.

(f)    *Supply of Spunbond to the Trading Division*. The Operations Division shall effect intracompany transfers of Spunbond to the Trading Division, and NWI shall sell Spunbond to the Trading Division, at such prices determined by the Company's chief financial officer at the beginning of each fiscal year for the next fiscal year, based on the following considerations: (*i*) 50% fixed costs (indirect costs + G&A expenses + 8% profit) and (*ii*) 50% variable costs according to changes in the cost of polyester chips per PCI-West Europe (adjusted on a quarterly basis). Such intracompany transfers shall include Spunbond produced by NWI in Italy for the North American market and specifically excludes Spunbond produced by NWI in Italy that is sold in Europe. Furthermore, any Spunbond produced by a new production line or lines acquired in the future by NWI-USA, NWI or affiliated entities to those companies, will be included in the intracompany transfers referenced in this paragraph 3(f) if shipped to North American for sale.

(g)    *Travel and Lodging Expenses Incurred by The Trading Division*. The Trading Division shall be responsible for all reasonable travel and lodging expenses incurred by personnel dedicated to the Trading Division if incurred and documented in a timely manner in accordance with NWI-USA's Travel Policy, as amended from time to time. Any expenses not incurred or documented in accordance with this Section 3(g) shall not be reimbursed.

4.    **Distributions.**

The amount and frequency of distributions of income shall be determined by the NWI-USA's board of directors at least annually after completion of the Company's audited financial statements.

5.    **Term and Termination.**

(a)    The term of this Agreement shall commence on the Effective Date and shall continue until the occurrence of any of the following events: (i) the mutual agreement of the Parties to terminate this Agreement; (ii) the insolvency, appointment or receiver, filing of bankruptcy, or cessation of business in the ordinary course of business of any of the Parties; (iii) the exercise of the Option by JKK as provided in paragraph 6 of this Agreement.

(b)    NWI and JKK hereby agree that as of the Effective Date the Agent Mandate granted by NWI to JKK will automatically terminate.

6.    **Option to Acquire Class A Membership Units by JKK.** NWI and HSN hereby grant an option to JKK to acquire 20% of each of NWI 's and HSN's Class A membership interests in the Company pursuant to the Option Agreement attached to this Agreement as Attachment B.

7.    **Status of JKK and its Employees.** JKK's relationship to NWI-USA and NWI is that of a member of NWI-USA and an independent contractor to NWI-USA. Nothing in this Agreement shall constitute any other relationship, including any employment relationship by NWI-USA or NWI of any JKK employee. All sales and marketing activities by JKK and its personnel shall be in the name of NWI-USA.

8.    **Representations and Warranties.**

(a)    *Legal Authorization.* The Parties hereby represent and warrant one to another that they are authorized and legally capable of entering into this Agreement.

(b)    *Quality Indemnification.* NWI-USA and NWI hereby indemnify JKK from any claim or demand asserted by any third party against JKK relating to the quality of any Spunbond or other product manufactured by them individually and sold by JKK. This indemnification shall be limited to sales and marketing activities conducted by JKK and its personnel in the name of NWI-USA.

(c)    *Conduct Indemnification.* JKK hereby indemnifies and agrees to hold harmless NWI-USA and NWI from any claim or demand asserted by any third party against NWI-USA and/or NWI relating to any act, failure to act, or other matter arising from the conduct of JKK or any employee, director, agent or independent contractor acting, or purporting to act, on behalf of JKK, NWI-USA or NWI.

9.    **Assignments, Transfers.**

(a) Except as set forth in subparagraph 9(b), no party to this Agreement shall assign, encumber or transfer its rights or duties under this Agreement, except to an affiliated entity, without the express written consent of the other parties. Any transfer or assignment made without such consent shall not relieve the transferor or assignor of its duties or obligations under this Agreement.

(b) Nothing in this Agreement shall restrict NWI and HSN from pledging all or a portion of the Company's assets to a third party.

10.    **Dispute Resolution.** Any dispute arising from the subject matter of this Agreement that cannot be resolved by good faith negotiations between the Parties shall be submitted to non-binding mediation in Mobile, Alabama. If a resolution of the dispute is not achieved by such mediation, the Parties hereby submit to the exclusive jurisdiction of the courts in Mobile, Alabama for adjudication of the dispute.

11.    **Choice of Law.** The laws of the State of Alabama shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Parties.

12.    **Notices.** Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be: (i) delivered personally to the Member to which the writing is directed or (ii) sent by certified mail – return receipt requested, postage and charges prepaid, addressed as follows:

*If to Nonwovens Industries (USA), L.L.C.*

> Nonwovens Industries (USA), L.L.C.
> Attn:  Mr. Dave Smith
> 2203 Perimeter Road
> Mobile, Alabama 36615
> U.S.A.

>          With a simultaneous copy to:          Hand Arendall, L.L.C.
>                                                 Attn:  Gregory R. Jones, Esq.
>                                                 Post Office Box 123
>                                                 Mobile, Alabama 36601
>                                                 U.S.A.

*If to Nonwovens Industries SpA*

> Nonwovens Industries SpA
> Attn:  Mr. Roberto Baroni
> Sede Amministiva
> Via Larga, 8
> 20122 Milano
> Italia

*If to J. Kenneth Kearney USA Ltd.*

> J. Kenneth Kearney USA Ltd.
> Attn:  Mr. J. Kenneth Kearney

111 Speen Street
Framingham, Massachusetts 01701
U.S.A.

Any such notice shall be deemed to be delivered, given and received as of the date so delivered, if delivered personally, or as of the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail (if sent by NWI-USA or JKK) or Italian mail (if sent by NWI SpA).

13.  **Incorporation of Attachments.** Any attachment referenced in this Agreement is incorporated herein by reference.

14.  **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which counterparts collectively shall constitute one instrument representing the Agreement among the Parties.

15.  **Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

16.  **Binding Effect.** Except as otherwise provided in this Agreement, every provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective successors, transferees, and assigns (to the extent any transfer or assignment of interest is consented to by the Parties hereto).

17.  **Severability.** Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

18.  **Further Action.** Each of the Parties agree to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement. The Parties specifically anticipate, and hereby agree, to execute an Amended and Restated Operating Agreement of Nonwovens Industries (USA), L.L.C.

[This Space Left Intentionally Blank]

19.  **Entire Agreement and Construction.** This Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof and shall supercede any prior agreements or understandings between the Parties with respect to this subject matter.

1804466

Every provision of this Agreement shall be construed according to its fair meaning in the English language and not strictly for or against any Member.

IN WITNESS of the above, the Parties have executed this Agreement.

HARTGE SMITH NONWOVENS, L.L.C.

By: _____

Name: _____
           (Printed)

Title: _____

NONWOVENS INDUSTRIES SpA

By: _____

Name: _____
           (Printed)

Title: _____

J. KENNETH KEARNEY USA LTD.

By: _____

Name: _____
           (Printed)

Title: _____

# ATTACHMENT A

## Performance Objectives for the Trading Division
## for the First Period of Operations

Sales:      2,000 Metric Tons   (Flat bond)

          3,000 Metric Tons   (Standard)

Attachment B to Sales and Marketing Agreement

## OPTION TO ACQUIRE CLASS A MEMBERSHIP INTEREST

THIS OPTION AGREEMENT ("Option Agreement"), made effective the 17th day of September, 2003 ("Effective Date") by and between: Nonwovens Industries (USA), L.L.C., a limited liability company organized under the laws of the State of Alabama ("NWI-USA" and "Company"); Nonwovens Industries SpA, a corporation organized under the laws of Italy ("NWI"), Hartge Smith Nonwovens, L.L.C. ("HSN"), an limited liability company organized under the laws of the State of Ohio and; J. Kenneth Kearney USA Ltd. ("JKK"), a corporation organized under the laws of the State of New York.  NWI-USA, NWI, HSN and JKK are collectively referred to in this Agreement as the "Parties".

In consideration of the premises set forth below, and other good and valuable consideration, the sufficiency of which is hereby acknowledged by the Parties, it is agreed:

1.    **Grant of Option.**  NWI and HSN hereby grant to JKK the right and option (the "Option") to acquire 20% of each of NWI's and HSN's Class A membership interests in the Company pursuant to paragraph 7 of the Sales and Marketing Agreement entered into by the Parties and made effective the 17th day of September, 2003, on the terms and conditions set forth in this Option Agreement. The Option shall only be exercisable if JKK exercises the Option to acquire the full 20% percent interest of each of NWI's and HSN's Class A membership interests, and for no lesser amounts, in a single transaction from both NWI and HSN.  JKK's exercise of the Option will, therefore, result in the following allocation of membership interests *subsequent* to the timely and proper exercise of the Option:

| Member | Class A Membership Interest |
|--------|------------------------------|
| NWI Group | 60% |
| HSN Group | 20% |
| JKK Group | 20% |

2.    **Price and Terms of Payment.**  The purchase price of the membership interests subject to this Option Agreement shall be a total of $3,000,000 in cash, simultaneously payable in to NWI and HSN as follows:

| | |
|--------|------|
| Payment to NWI Group | $2,250,000 |
| Payment to HSN Group | $  750,000 |

3. **Option Exercise.** The Option may only be exercised as of the Effective Date and no later than 11:59 PM (Eastern Standard Time), March 31, 2006 (the "Option Termination Date"), in the following manner:

(a) Upon written notice by JKK to both NWI and HSN, delivered prior to the Option Termination Date, indicating JKK's intent to exercise the Option and to execute an amendment of the Joint Venture Agreement between NWI and HSN then in effect as of the date of JKK's exercise of the Option (and all other reasonably related document or documents required to effect the consequences of JKK's exercise of the Option); and

(b) Upon receipt by NWI and HSN of JKK's payment to both of them of the payment amounts set forth in paragraph 1 of this Option Agreement no later than the Option Exercise Date.

4. **Non-transferability of the Option.** The Option shall not be transferable or assignable by JKK without the prior written consent of NWI and HSN.

5. **Termination of the Option.** The Option shall automatically terminate:

(a) at the Option Termination Date; or

(b) upon a change of at least the controlling interest of JKK from that in place as of the Effective Date of this Option Agreement, without the prior written consent of NWI and HSN; or

(c) upon any attempted transfer or assignment of this Option by JKK without the prior written consent of both NWI and HSN;

(d) the insolvency, appointment or receiver, filing of bankruptcy, or cessation of business in the ordinary course of business of JKK.

6. **Change in Ownership Interests of NWI and/or HSN.** In the event of a change of ownership interests held by NWI and/or HSN prior to January 1, 2005, this Option Agreement shall remain binding upon the entities or persons holding membership interests in the Company as of the date JKK's exercise of this Option.

7. **Effect of Exercise by JKK of Option.** JKK's timely exercise of this Option Agreement shall cause the following events to occur simultaneously with such exercise:

(a) the cancellation of all issued Class B membership interests held by any of the Parties; and

(b) the automatic amendment of the Joint Venture Agreement by and between HSN and NWI which was made effective the 21st day of August,

2003, as that agreement may be amended from time to time, to provide for the admission of JKK as a member of the Company holding 20% of the membership interests in the Company and the acceptance by JKK of all of the rights and obligations of a member of the Company.

8.    **Potential Amendment of the Joint Venture Agreement.**  With the exception of documenting JKK's 20% ownership interest in the Company upon JKK's timely exercise of the Option, nothing in this Option Agreement shall be construed as giving JKK any right to negotiate or change the terms of the Joint Venture Agreement executed by and between NWI and HSN with an effective date of August 21, 2003, including, but not limited to, the composition of the Company's Board of Directors or the officers of the Company.

9.    **Dispute Resolution.**  Any dispute arising from the subject matter of this Option Agreement that cannot be resolved by good faith negotiations between the Parties shall be submitted to non-binding mediation in Mobile, Alabama. If a resolution of the dispute is not achieved by such mediation, the Parties hereby submit to the exclusive jurisdiction of the courts in Mobile, Alabama for adjudication of the dispute.

10.    **Choice of Law.**  The laws of the State of Alabama shall govern the validity of this Option Agreement, the construction of its terms, and the interpretation of the rights and duties of the Parties.

11.    **Counterparts.**  This Option Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which counterparts collectively shall constitute one instrument representing the Option Agreement among the Parties.

12.    **Headings.**  Section and other headings contained in this Option Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Option Agreement or any provision hereof.

13.    **Binding Effect.**  Except as otherwise provided in this Option Agreement, every provision of this Option Agreement shall be binding upon and inure to the benefit of the Members and their respective successors, transferees, and assigns (to the extent any transfer or assignment of interest is consented to by the Parties hereto).

14.    **Severability.**  Every provision of this Option Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Option Agreement.

15.    **Further Action.**  Each of the Parties agree to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Option Agreement.

16.     **Time of the Essence.**  Time shall be of the essence in the performance and exercise of any right or obligation created by the terms and conditions of this Option Agreement.

17.     **No Waiver.**  No act or omission of NWI or HSN, including specifically any failure to exercise any right, remedy, or recourse, shall be effective unless set forth in a written document, executed by both NWI and HSN, and then only to the extent specifically recited therein.

18.     **Entire Agreement and Construction.** This Option Agreement constitutes the entire understanding between the Parties with respect to the subject matter hereof and shall supercede any prior agreements or understandings between the Parties with respect to this subject matter. Every provision of this Option Agreement shall be construed according to its fair meaning in the English language and not strictly for or against any Member.

IN WITNESS of the above, the Parties have executed this Agreement.

**HARTGE SMITH NONWOVENS, L.L.C.**

By: _____

Name: ___Dave Smith_____
            (Printed)
Title: ___Chairman_____


**NONWOVENS INDUSTRIES SpA**

By: _____

Name: _____
            (Printed)
Title: _____


**J. KENNETH KEARNEY USA LTD.**

By: _____

Name: _____
            (Printed)
Title: _____


180469

NWI
v.
NWI

Nonwoven Industries (USA)

vs.

Nonwoven Industries SpA

Cne No. 03-0840-

The parties have reached a settlement agreement based on the attached draft with these modifications:

to para. 2: The amount is 254,475 euros.

to para. 7(b) and (c): The parties will use their best efforts to locate and return these items

to para. 10:
- the banks will provide "no claim" letters rather than releases
- all parties will indemnify the others from claims by third parties arising from the matters made the subjects of the lawsuit.
- the USA parties will notify the Italian banks that this dispute has concluded

to para. 12: Closing on or before July 9, 2004. The releases ⊗ will be effective upon performance of all other obligations. After closing, the lawsuit will be dismissed with prejudice by stipulation.
⊗ and cancellation of contracts

[signatures next page]

For plaintiff

Its PRESIDENT

David Smith

For defendant

Its

Pat Cloefel

Patrick H Smith
Mediator  5/3/04

1.  NWI (USA) would repay the cash money that Mr. Baroni directed to have deposited in America as follows:

| | | | | |
|---|---|---|---|---|
| a) | return to Sixtina Lombard Holding | US$ | 106,560.00 | it paid to HSN's account; |
| b) | return to Roberto Baroni | US$ | 500,000.00 | he paid to NWI's account;* |
| c) | return to Roberto Baroni | US$ | 30,000.00 | he paid to NWI's account;* |
| d) | return to Banca Populare de Crotone | US$ | 500,000.00 | NWF paid to NWI's account; |
| and | | | | |
| e) | return to Banca Populare de Crotone | US$ | 1,280,000.00 | NWF paid to NWI's account. |
| | TOTAL | US$ | 2,416,560.00 | |

2.  NWI (USA) is to repay NWT for invoices paid by NWT as follows:
a) pay to NWT for PSP (Salvatore) invoices paid to PSP** (approximately US$250,000.00); and
b) pay to NWT for WTA (Roger) invoice paid to WTA** (approximately US$ 12,875.00).

3.  NWI (USA) will ship all remaining rolled goods currently on the floor at NWI (USA) premises as directed by NWI (SpA) and at the cost of NWI (SpA).

4.  NWI (USA) will return "ISO" Disk provided by NWI (SpA) to NWI (USA).

5.  NWI (USA) will return "AutoCAD" Disk provided by NWI (SpA ) to NWI (USA).

6.  NWI (SpA) will provide NWI (USA) 100% credit for all invoices to NWI (USA):
(10 containers of products):   3 containers shipped to Mobile;
4 containers diverted to JKK in Simpsonville; and
3 containers delivered directly to Customers.

7.  NWI (SpA) will return to NWI (USA):
a)   Spinpack sent to NWI (SpA) for measuring etc.;
b)   Report given to Antonio Lumare from Perry Hartge on Spinning hole size and numbers; and
c)   software removed by WTA.

8.  Termination, full and final release of Sales and Marketing Agreement.  JKK will have to agree to this.

9.  Termination, full and final release of Joint Venture Agreement and any agreements relating thereto.

10. All parties, etc. shall provide full and final releases including;  HSN, NWI (USA) Dave Smith; Perry Hartge, Sixtina Lombard Holdings (SpA), NWI (SpA), NWF, NWT, Banca Populare de Crotone, Simest WTA, PSP, Roberto Baroni and Antonio Lumare,  J Kenneth Kearney Limited, Paul Miller, Ken Kearney.  Mr. Baroni is to agree to indemnify NWI (USA), Mr. Smith and Mr. Hartge for any claims by the European banks.  JKK will need to provide warranties that no statements had been made by them that would bind NWI (USA), Mr. Smith or Mr. Hartge to any obligations of any type and that they

agree to indemnify NWI (USA), Mr. Smith and Mr. Hartge in the event that such statements were made.

11.    The parties are responsible for their own legal fees.

12.    It is understood that reasonable times will be allowed for the accomplishment of the matters in this Agreement, but in no event will the time exceed 64 days. The law suit is to be dismissed and releases signed upon fulfillment of the provisions above.

*      This money was transfered from Mr. Baroni's Regions Account to NWI (USA), LLC's account.

**     Original invoices, proof of payments are required before there will be repayments, and releases are to be executed by creditors.

JOINT VENTURE AGREEMENT
BY AND BETWEEN
HARTGE SMITH NONWOVENS L.L.C. AND NONWOVENS INDUSTRIES SPA

This Joint Venture Agreement ("Agreement"), made effective the 21st day of August, 2003 ("Effective Date") by and between Hartge Smith Nonwovens L.L.C. ("HSN"), a limited liability company organized under the laws of Ohio and Nonwoven Industries SpA ("NWI"), a company founded in accordance with the provisions of Italian law.  HSN and NWI are collectively referred to in this Agreement as "the Parties".

Whereas, the Parties desire to jointly conduct a business operation headquartered in the United States for the purpose of manufacturing spunbond and possibly related products, conducting research and development relating to spunbond and alternative markets for that product, and to sell the manufactured product or products, and

Whereas, the Parties are willing to invest money, equipment, management expertise and other resources to facilitate the operation of the joint venture, and;

Whereas, the Parties agree that the most desirable form of business for conducting the joint venture is through the establishment and operation of a limited liability company which will at least initially be jointly owned by the Parties.

Now, therefore, in consideration of the mutual promises contained in this Agreement, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  <u>Creation of Joint Venture</u>.  HSN and NWI, the latter through its wholly-owned subsidiary Nonwoven Foreign Investment SRL ("NWF"), a company founded in accordance with the provisions of Italian law, hereby create a joint venture to manufacture and sell spunbond and possibly related products, and to conduct research and development activities relating to spunbond and alternative markets for that product. The joint venture will be conducted in the form of a limited liability company organized under the laws of the State of Alabama named "Nonwovens Industries (USA), L.L.C." ("NWI-USA" or "the Company").

2.  <u>Contributions, Plant and Equipment</u>.  Upon execution of this Agreement:

(a) HSN shall sell and deliver a bill of sale to NWI-USA for Factory Equipment, as defined below, for the sum of $1,375,000 in cash or immediately available funds and 25% of the shares of NWI-USA;

(b) NWF shall deposit into NWI-USA's account the sum of $3,271,000 for the initial capitalization of NWI-USA no later than September 30, 2003, and;

1



(c)  The Parties acknowledge that Societá Italiana Per Le Impresse Allestero ("SIMEST") will provide interest-free financing to NWF for use in operating the Company and shall be granted 20% of the shares of NWI-USA.

(d)  The "factory equipment" referenced above means the spunbonding equipment listed in Ohio Secretary of State Uniform Commercial Code filing number AM53342 formally located at 400 Redbank Road, Cincinnati, Ohio, which was previously owned by Stearns Extruded Textiles Corporation and sold by CIT to HSN following foreclosure by CIT.

(e)  NWI-USA will negotiate and enter into a minimum 10-year real estate lease from the Mobile Airport Authority for appropriate facilities located in the Brookley complex in the City of Mobile, Alabama, on commercially reasonable terms, in which to conduct the operations of the Company as contemplated in this Agreement. The Secretary of the NWI-USA is hereby authorized to execute such lease on behalf of the Company.

3.  Representations and Warranties by HSN.  HSN hereby represents and warrants that:

(a)  it is legally entitled to transfer  good and marketable title to the Factory Equipment, free of any liens;

(b)  no material property rights relating to the Factory Equipment are pending or, to the best of HSN's knowledge, are threatened; or

(c)  no environmental claims, investigations or other proceedings against HSN are pending or threatened.

4.  Conduct of the Joint Venture.  The affairs of NWI-USA shall managed by a board of directors and the Company's duly appointed officers.

(a)  The board of directors and officers of the Company shall be:

### Board of Directors

Roberto Baroni – Chairman of the Board
David Smith – Managing Director
Antonio Lumare – Director at Large

### Officers

Roberto Baroni  -  President and Chief Executive Officer
David Smith – Secretary, Treasurer and Chief Financial Officer
Antonio Lumare – Vice President & Chief Engineering Officer
Perry Hartge – Vice President
J. Kenneth - Vice President
Paul Miller - Vice President

2

(b) The members of the Company's Board of Directors and its officers shall have the authority and fiduciary duties imposed on boards of directors and officers under Alabama law.

(c) Messrs. Baroni and Smith shall be paid an annual fee of $150,000 for their services as members of the Board of Directors of NWI-USA, and each shall be entitled to reimbursement for an automobile and health care benefits established from time to time by the Company's Board of Directors.

5. <u>Title to Property and Ownership Interests</u>. (a) All legal title to property acquired by the joint venture, whether real or personal, shall be taken in the name of NWI-USA.

(b) The initial ownership interests of NWI-USA shall be as follows:

| | |
|---|---|
| HSN | 25% |
| NWF | 55% |
| SIMEST | 20% |

(c) Membership interests representing the interests set-forth above shall be issued by NWI-USA within five (5) business days subsequent to NWF's deposit of the funds referenced in Section 2b of this Agreement.

(d) The membership interests of the Parties set-forth above shall not be involuntarily diluted. In the event NWI-USA's financial condition necessitates the issuance of additional equity in the company all of the Parties will be offered the opportunity to acquire additional ownership interests valued at least the pro rata ownership interest of a party multiplied by the amount of equity to be acquired. If a party does not agree with the amount of the additional equity proposed, then the Parties will negotiate in good faith whether such additional equity shall be made notwithstanding the dillutive effect thereof.

(e) If HSN or NWF, or their successors in interest, desire to sell all or any of its ownership interest in NWI-USA to a third party, such selling party shall first offer to sell its interest to the non-selling party at the same price and substantially the same terms and conditions offered by a third party. If the non-selling party desires to purchase the selling party's shares it must accept the selling party's offer in writing within thirty (30) days and make payment for the shares within thirty days from the date of acceptance.

(f) The net profits and losses realized by NWI-USA shall be proportional to the respective ownership interests of the Parties.

(g) In the event of an initial public offering of shares in NWI-USA or its successor in interest, the Parties will negotiate in good faith fair and reasonable terms relating to tag and drag-along rights and a market-standoff provision providing for a 180-day lock-up.



6. <u>Technology Agreement</u>. NWI-USA and NWI shall enter into a technology agreement whereby NWI will provide all technology rights, expertise, training, technology upgrades and improvements to the spunbond production line created and utilized by NWF including, but not limited to, supervision from NWI. NWI-USA will pay One Hundred Thousand ($100,000) Dollars per year to NWI for such technology agreement for all such services inclusive of all disbursements incurred for travel, lodging, meals, etc. associated with providing such services.

7. <u>Records and Accounting</u>. (a) NWI-USA shall maintain a complete set of records, statements, and accounts concerning the total operations of its operations, in which books shall be entered, fully and accurately, each transaction pertaining to the Company's operations. All such books and records will be open at all times for inspection and examination by the Parties or their representatives. The books and annual balance sheet of the Company shall be annually audited by an independent certified public accountant.

(b) NWI-USA's fiscal year shall commence on January 1 of each calendar year, except for the first year of operations which shall commence on August 21, 2003, and shall end on December 31 of each year.

8. <u>Redemption Option</u>. In consideration of its oversight of NWI-USA, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, NWI SpA or its successor is hereby granted an option to purchase the ownership interests in NWI-USA of HSN or its successors after seven (7) years from the Effective Date, at a purchase price equal to higher of the net worth of NWI-USA or the multiple of 5 times of the EBITDA resulting from the consolidated profit and loss statement of NWI-USA and NWIUSA-T (an entity identified in Section 12) as of 60 days prior to the date of NWI SpA's exercise of such option. Such consolidated balance sheets shall be based on independently audited financial data of both companies.

9. <u>Insurance</u>. NWI-USA shall obtain insurance to cover, at a minimum, general liability; premises liability; and workers' compensation. The premiums shall be recognized as business expenses of the Company.

10. <u>Assignments and Transfers</u>. No party shall assign or transfer its rights or duties in the NWI-USA or this Agreement without the express written consent of the other parties and in accordance with the provisions of Sections 5 and 8 of this Agreement. Any transfer or assignment made without the consent of the other parties shall not relieve the transferor or assignor of its duties or obligations under this Agreement.

11. <u>Employee Matters</u>. (a) All NWI-USA employees shall, upon commencement of their employment, be required to execute appropriate confidentiality agreements protecting the confidential and proprietary information of the Company. Certain employees, as determined by the President of NWI-USA, shall be required to also execute non-competition agreements appropriate to their level of responsibility and access to confidential and proprietary information of the Company.

4



(b) Perry Hartge ("Hartge"), a principal of HSN, will provide his best efforts and knowledge to help ensure success of the relocation and start-up of the Factory Equipment. Hartge will be provided an Executive Services Agreement which will include, *inter alia:* annual compensation of $100,000; benefits; automobile allowances; cellular telephone service; an executive health plan; reimbursement of business travel expenses; a non-competition provision and a provision regarding the protection of certain intellectual property rights. The Agreement will also include a three-year renewable term. Hartge's claim to the intellectual property described at Attachment A to this Agreement shall be honored and made exempt from the provisions of the Executive Services Agreement, provided, however, that Hartge will license and make such intellectual property available for use by NWI-USA on a royalty-free, perpetual and world-wide to the extent such intellectual property can be protected under the laws of the State of Alabama and the United States. The other specifics of the terms of such Executive Services Agreement shall be determined by the President of NWI-USA following good faith discussions with Hartge.

(c) The Parties acknowledge that David Smith ("Smith") possesses certain confidential information concerning customer information, goodwill, technology and products proprietary to New Pig Corporation of Tipton, Pennsylvania, and New Pig Corporation's subsidiaries relating to the sorbent products business. The Parties further acknowledge that Smith has a legal and contractual duty to New Pig Corporation and its subsidiaries to protect and not disclose such information, and he shall not be required to use such information in the performance of his duties with NWI-USA or NWUSA-T.

12. <u>Structure and Operation of NWI-USA.</u>

(a) *Two Divisions.* NWI-USA shall be organized, managed and operated in accordance with the "Nonwovens Industries (USA), L.L.C. Operating Agreement", as amended from time to time ("Operating Agreement"), with at least two divisions: (*i*) an Operations Division, responsible for the manufacture, research and development and general administration of the Company, and; (*ii*) a Trading Division, responsible for the sale and marketing of Spunbond and any related product or products manufactured or developed by the Company.

(b) *Operating Agreement Applicability.* The terms and conditions of the Operating Agreement shall govern the conduct, rights and privileges of the Parties relating to the matters contemplated by this Agreement in the event of any inconsistency between the terms and conditions of this Agreement and the Operating Agreement.

(c) *Books and Records of Divisions and Capital Accounts.* The Company shall maintain appropriate books and records setting forth the profits and losses achieved or incurred by each division of the Company. Separate capital accounts shall also be maintained for each Member in accordance with generally accepted accounting principles and the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

(d) *Membership Interests.* Membership interests in NWI-USA shall be designated as Class A Units and Class B Units, with the rights and preferences set forth in this Agreement and the Members holding either class of units shall be designated as "Class A Members" and/or




"Class B Members". Class A Members shall share in the profits and losses of the Operations Division in proportion with their ownership percentages. Class B Members shall share in the profits and losses of the Trading Division in proportion with their percentages of membership interests and without priority to any member.

(e)    *Voting Rights.*  Class A Members shall be entitled to one vote for each Class A Unit held by them at the time of a vote.  Class B Members shall not be entitled to any vote.

13.    Dispute resolution.  Except for any dispute between NWF and SIMEST relating to financing or loan agreements which require resolution in Italy, any dispute relating to the terms of this Agreement that cannot be resolved by good faith negotiations between the Parties shall be submitted to non-binding mediation in Mobile, Alabama. If a resolution of the dispute is not achieved by such mediation, the Parties hereby submit to the exclusive jurisdiction of the courts in Mobile, Alabama for adjudication of the dispute.

14.    Choice of Law.  This Agreement, and all agreements, options, and other obligations contemplated by it, shall be governed by and construed under the laws of the State of Alabama.

15.    Term.  The term of this Agreement shall commence on the Effective Date and shall continue until the occurrence of any of the following events:  (*i*) the mutual agreement of the Parties to terminate the Agreement, or; (*ii*)  the insolvency, appointment of receiver, filing of bankruptcy, or cessation of business in the ordinary course of business (excepting the cessation of business by HSN of any business other than participation in the joint venture between the Parties contemplated by this Agreement) of any of the Parties.

16.    Entire Agreement.  Except as provided by Section 12(b) of this Agreement, this Agreement contains the entire agreement between the Parties and supercedes and replaces any and all other agreements, written or oral, made at any time between the Parties, or between HSN and NWF.

IN WITNESS of the above, the Parties have executed this Agreement.

HARTGE SMITH NONWOVENS, L.L.C.

By: _____
              (Signature)

Name: _Dave Smith_
              (Printed)
Title: _Chairman_

Nonwoven INDUSTRIES SpA

By: _____
              (Signature)

Name: _ROBERTO BARONI_
              (Printed)
Title: _CHAIRMAN_

6

161945

## Attachment A

### Intellectual Property Claimed by Hartge

1.      Impending Doom:  A new spunbond spinning system developed by Hartge constituting a method for extruding a matrix of fibers, quenching, stretching, ejecting and forming a fleece spunbond web.  This novel spinning method and apparatus includes all ideas, concepts, models, prototypes and calculations related to the invention. A detailed description of the invention "Impending Doom" will be documented, sealed and filed as a matter of record with HSN's attorney as of the Effective Date.

2.      Dryer Sheet Market Data:  Earned data relating to the Fabric Softener Dryer Sheet markets technology, business plans, financial models and customer secrets covered in confidentiality agreements.

3.      BiComponent Process Knowledge:  Earned Process information relating to the extrusion of polymers to form fibers that contain two or more polymers in each fiber.

4.      Meltblown Process and Market Knowledge:  Earned technical, marketing and financial modeling knowledge pertaining to the nonwovens field of melt-blowing.



7