UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                      |   |                                   |
|--------------------------------------|---|-----------------------------------|
| J. KENNETH KEARNEY USA LTD.,         | ) |                                   |
|             Plaintiff,               | ) |                                   |
| v.                                   | ) | Civil Action No. 04 CV 12643 RCL  |
| DAVID SMITH,                         | ) |                                   |
|             Defendant.               | ) |                                   |

**AFFIDAVIT OF DAVID SMITH IN SUPPORT OF**
**<u>DEFENDANT'S MOTION TO STAY LITIGATION</u>**

I, David Smith, do hereby depose and state the following:

1. I am of legal age, have personal knowledge of the matters set forth herein and would be competent to testify about the information contained in this Affidavit.

2. I am the Managing Director, Secretary, Treasurer and Chief Financial Officer of Nonwovens Industries (USA), L.L.C., ("NWI USA"), an Alabama limited liability company. I am also the Managing Director of Hartge Smith Nonwovens, L.L.C. ("HSN"), an Ohio limited liability company, which is registered to do business in Alabama. HSN's principal office is in Orange Beach, Alabama.

3. In March 2002, my company, HSN, completed the purchase of a machine ("Equipment") from CIT Equipment Finance ("CIT") in Cincinnati, OH. The Equipment produces a synthetic fiber web called a nonwoven. This fabric is used throughout the world in

thousands of applications, including carpets, clothing, automobiles, furniture, fabric softeners, swiffers, filtration, and roofing.

4. CIT had foreclosed on the Equipment when its then owner/parent, Stearns Technical Textiles Company ("Stearns"), filed a Chapter 11 petition for bankruptcy.

5. The fabric that was produced from this Equipment by Stearns was sold to many of the distribution customers of nonwoven fabrics around the world. At the time of the sale of the Equipment, HSN was provided with a list of all of these customers by CIT. See, e.g., Stearns Extruded Textiles Company, Executive Summary, March, 2001, attached hereto as **Exhibit A.**

6. HSN was in contact with these customers before it became involved with J. Kenneth Kearney USA, LTD ("JKK") and I continue to be in contact with these customers without JKK's assistance.

7. Furthermore, this customer information is also generally known in the spunbond industry. It is not proprietary to JKK or any other company.

8. The information provided to NWI USA by JKK consists of nothing more than a prospective client list, which mirrored the information NWI USA already had about customers and potential customers in the industry. See, e.g., E-mail communication dated 6/10/03 from Paul Miller to Dave Smith (and others), Re: Status on polyester, attached hereto as **Exhibit B.**

9. I was first introduced to JKK by the principals of an Italian company, Nonwovens Industries SpA ("NWI SpA"). NWI SpA owns and operates a similar nonwovens manufacturing plant in Italy.

10. HSN decided to enter into a joint venture with NWI SpA in order to finance the move of the Equipment from Cincinnati, Ohio to Alabama, at a cost of approximately $3 million. The entity that was formed in anticipation of this joint venture is NWI USA.

11. About the same time, NWI SpA introduced me (and HSN) to JKK (whose principals were J. Kenneth Kearney and Paul Miller). At that point, NWI SpA and JKK had already entered a marketing arrangement and had (and continue to have) a long-standing business relationship. NWI SpA wanted NWI USA to enter into a similar marketing agreement with JKK. Because NWI SpA was to be a majority shareholder of the joint venture, HSN/NWI USA succumbed to the pressure to enter into a sales and marketing agreement with JKK. The Sales and Marketing Agreement between NWI SpA, NWI USA and JKK ("S&M Agreement), which has been marked as Exhibit A to the Motion to Stay, was entered into on September 17, 2003.

12. Prior to the execution of the S&M Agreement, JKK, through its counsel, expressed an interest in having all of the parties to the S&M Agreement sign a confidentiality and nondisclosure agreement. I refused to execute such an agreement and neither myself nor anyone else authorized to act for HSN or NWI USA ever signed such an agreement with JKK.

13. With regard to the Joint Venture Agreement, NWI SpA was never out of default. It bounced the deposit check. Although NWI SpA eventually deposited some money into the joint venture, only a small fraction of what was owed was paid into the joint venture by September 30, 2003, the due date under the Joint Venture Agreement, which is marked as Exhibit B to the Motion to Stay.

14. Therefore, NWI USA and HSN commenced an action against NWI SpA for a declaration dissolving the joint venture. The capitalization was to have been completed by September 30, 2003. ("Alabama Litigation"). However, as late as the morning the Alabama Litigation commenced, December 9, 2003, only $1 million of the required $3.271 million (or total $4 million) capitalization had been paid.

15. In the Alabama Litigation, NWI SpA filed with the Court much, if not all, of JKK's allegedly confidential information without a protective order, thereby making it public information.

16. As the Alabama Litigation progressed, the parties were ordered to binding mediation. As a result, we reached a settlement wherein NWI USA agreed to return any money that NWI SpA had advanced to the joint venture, the joint venture was to be dissolved, and the parties were to exchange mutual releases.

17. The settlement agreement, marked as Exhibit C to the Motion to Stay, also called for a release of the S&M Agreement to be signed by JKK. At the mediation of the Alabama Litigation, Roberto Baroni ("Baroni"), NWI SpA's principal, indicated to me that he would have no problem securing a release from JKK (including a release of the S&M Agreement) to resolve the Alabama Litigation. All parties to the mediation were aware that JKK's release was consideration for the settlement agreement.

18. Instead of providing the agreed upon release, NWI SpA immediately created a new joint venture with JKK in Boston and began vigorously selling in the nonwovens market. NWI SpA and JKK continue to be in business together today.

19. Two months after the settlement agreement was reached in the Alabama Litigation, however, NWI SpA advised my attorneys in the Alabama litigation that it was unable to secure a release from JKK, which effectively negated the settlement.

20. Thereafter, JKK approached NWI USA seeking $1.25 million in return for executing the release of the S&M Agreement, which Baroni had previously stated he would be able to secure in exchange for settlement of the Alabama Litigation. NWI USA refused to pay and correspondence between JKK and NWI USA through counsel was exchanged. At no time was the claim of $1.25 million directed to me individually.

21. However, on or about November 17, 2004 JKK sued me personally in the Middlesex County Superior Court in Massachusetts.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 19th DAY OF JANUARY, 2005.

__/s/ David Smith_____
David Smith

## CERTIFICATE OF SERVICE

I, Windy L. Rosebush, hereby certify that on this 19th day of January, 2005, I caused a copy of the foregoing document to be served upon William A. Zucker, Esq. and Kristin M. Cataldo, Esq. of Gadsby Hannah LLP, 225 Franklin Street, 21st Floor, Boston, MA 02110 by filing the same electronically.

_/s/ Windy L. Rosebush_____
Windy L. Rosebush

# STEARNS EXTRUDED TEXTILES COMPANY
## EXECUTIVE SUMMARY
### March, 2001

*[Handwritten notes in margin: BLOWER / LOCAL GUY / HP THOMPSON / UTILITY & THERMAL / 513 831 8044 / HARVEY STONE / 96 97]*

I. **COMPANY HISTORY AND VISION**   *[handwritten: 513-248-3200]*

The Company was formed in 1996 as an extension of it's sister company, Stearns Technical Textiles Company. Located in Cincinnati, Ohio, it primarily produces spun bond non-woven polyester for the furniture, automotive, filtration and agricultural markets. It is the intention of management to sell the assets of the firm to a strategic buyer or to develop a joint venture with a strategic partner.

SETC is prepared to offer its equipment, management and book of business to the right buyer who can add light weight spun bonded polyester production capacity to its existing products – and expand into the market quickly with a low cost of entry.

Presently, SETC is soliciting new business for the plant. We are actively obtaining commitments for 100% of the plant's capacity, with almost 70% of its capacity forecasted to be committed by the end of March, 2001. When critical capacity commitment levels are obtained, the plant will begin continuous production. This is anticipated to occur by July, 2001. By 2002, it is anticipated that SETC will have gross revenue of $6.0 million. By 2006, the revenue is forecasted at $12.0 million, as capacity utilization and new alliances for over-capacity are realized.

II. **THE MARKET AND CURRENT STATUS**

The market for non-woven spun bond polyester and polypropylene is approximately 750,000,000 pounds. The capacity of the SETC equipment represents 0.8% of this volume. This plant has produced spun bond polyester for SETC and has been designed have the capability to produce spun bond polypropylene.

Historical customers include:
- Foamex (US and International)
- General Felt
- Fruedenberg
- Hanes Converting
- Ahlstrom
- Midwest Filtration
- Kleen Brite
- Foothills

Current prospects include:
- Chiquita
- Dole
- Visteon (Ford Motor)
- Delphi (General Motors)
- Textron
- Dial Corporation
- Louisville Bedding

At its peak, in 1999, SETC sold $5,450,000 of spun bond polyester. In 2000, SETC lost it's largest customer and implemented a shut down of the plant. Due to outside circumstances and market conditions, SETC delayed any strategic actions until now.

III. **EQUIPMENT SUMMARY**

- Purchased and installed in 1996
- Manufactured by Non Woven Technologies of Milan, Italy
- 3.2 meter (126 inch) useable width
- Runs polyester, but also designed to run polypropylene
- Used for homopolymer point bonding, also capable of flat bonding
- Basis weight capabilities: 15 to 200+ GSM
- Capacity (at 42 GSM): 6,300,000 pounds or 2,850 metric tonnes per year.

IV.  **EMPLOYEE AND FACILITY SUMMARY**

- 18 skilled supervisors, maintenance and operating personnel are on staff to prepare for the re-launch of the products
- Production is located in a secure, updated manufacturing facility
- Five year lease, until August, 2004, with SETC's option for an additional five years
- Lease inflator of the CPI
- Building is controlled by a related corporate entity

V.  **FINANCIAL HIGHLIGHTS**

|  | 1996 | 1997 | 1998 | 1999 | 2000 partial |
|---|---|---|---|---|---|
| Gross Sales | $379,000 | $1,944M | $4,613M | $5,450M | $2,213M |

|  | 2001 partial | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| Gross Sales | $2,500M | $6,000M | $8,000M | $10,000M | $11,000M | $12,000M |
| EBITDA | ($690M) | $1,100 | $1,700 | $2,000 | $2,250 | $2,400 |

VI.  **INVESTOR OPTIONS AND CONSIDERATIONS**

SETC invested over $12,000,000 to purchase and install its plant in 1996 and 1997. The replacement cost today for similar production capacity is over $17,000,000 and would take almost three years from purchase commitment to first production. Throughout the shut down period, SETC has maintained a full staff of maintenance personnel and key production employees in preparation for the plant re-launch.

SETC offers both a full asset sale option or a partnership, where the new strategic partner could have controlling interest in the enterprise. SETC owners have a current successful 50%/50% joint venture with Toyobo Corporation, of Japan, for the production of components for the automobile industry (primarily Toyoto) We are familiar with what it takes to maintain a successful partnership.

A full purchase price begins at $12,000,000 for the business. This includes the equipment, personnel, customer lists, records and all intellectual property. The price can be a blend of initial payment and an earn-out. We are available to show the plant at your convenience.

| SETC Contacts: | Morley Thompson, Sr. | Chairman | 513-948-5205 |
|---|---|---|---|
|  | Morley Thompson, Jr. | President | 513-948-5291 |

```
Subj:    Status on polyester
Date:    6/10/03 3:41:47 PM Central Daylight Time
From:    pmiller@jkkltd.com
To:      lumare@nonwov.com
CC:      Smithmobile@aol.com, KKearney@jkkltd.com, robertobaroni@iol.it
Sent from the Internet (Details)
```

The following is a brief update on Polyester Qualification Process:

Sponge Cushion    Tested Converted Rolls ( We had to eliminate wrinkles ) 19 gsm was approved. Order expected for August / September Volume is 2 containers month

Louisville Bedding    17 gsm was approved for waterproof application Volume is 1 container month. Much higher volume opportunity 8 containers per month is pending meeting with Antoinio Lumare to define product specifications. Polyester will replace Cerex

Harodite    reorder 17 gsm and expecting new order for the brighten 34 gsm as well as sample roll of 85 gsm   volume 2 - 3 containers per month

Xamax    Waiting for new factory to open. Currently we supply 3 - 4 containers per month from Asia

Foam-ex    18 gsm approved waiting for commercial orders for August / September Volume is 2 trucks month

Precision    Testing 34 gsm as well as 25 gsm, Volume if approved 1 - 2 trucks month

Hanes    Evaluating market size for 230 gsm product, Negotiations ongoing regarding prices and volumes

Foothills    Approved 17 and 34 gsm orders expected volume 1 - 2 truck 6 - 8 weeks

Internet    Shipped 10000 lbs for further qualification account can deliver 5 - 6 trucks per year

PGI    Still evaluating, The best bet will be flat bond

Kleentest    has been approached regarding fabric softener, need flat bond samples

Lever Bros    Pending Flatbond

Polymer Packaging    Evaluating 34 point bond, Volume 1 truck 6 - 8 weeks

US Nonwovens Waiting Flatbond for fabric softener

Coinse    Testing 17 gsm for roofing Volume TBD

KC    waiting for flatbond

Midwest Filtration    Reviewing Pointbond for nonfiltration applications

Oxco    Testing for carpet backing

Upaco    Insole lamination current supply Indonesia

Powell Corporation    Glass mat laminator    1truckload month 17 gsm has passed field test orders pending

I provide a more detailed list latter this month. I expect to have more results that will commercialize over the summer. Majority of customers would like to have production / inventory in the states.

Key issues:

Formation on pointbond needs to be improved for higher margin applications

Flatbond samples are required many customers

Finalization of contract between all parties to create Nonwoven Trade

Details on Freudenberg