## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| J. KENNETH KEARNEY USA LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| v. ) | NO. 04 CV 12643 RCL |
| ) | |
| DAVID SMITH, ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY LITIGATION

Plaintiff J. Kenneth Kearney USA Ltd. ("Kearney USA") respectfully submits this

Opposition to defendant David Smith's ("Smith") Motion to Stay Litigation. Smith's motion

should be denied because:

(a)     The Massachusetts case is the first case in time that involves Kearney

USA. It is based on independent claims of misrepresentation by Smith. Plaintiff's choice of

forum should rarely be disturbed. No compelling circumstances have been demonstrated in that

it is premature to evaluate the merits of Kearney USA's claim of misrepresentation and Smith's

arguments are simply makeweights to try and shift the locus of the lawsuit to Alabama;

(b)     This Court is the proper forum for Smith to answer for his fraudulent

misrepresentations to Kearney USA, which misrepresentations caused injury to Kearney USA in

Massachusetts.[1] Contrary to Smith's assertions, this litigation *does not* arise out of the *terms* of

a marketing agreement between Kearney USA and an entity not even party to this suit, but

rather arises out of Smith's intentional, fraudulent scheme to cause Kearney USA to stop

---

[1]     Smith has answered the Complaint and does not raise insufficient personal jurisdiction as a defense.

pursuing other opportunities which would have brought competition to Smith's new venture, and to acquire Kearney USA's confidential pricing and market information in order to further his venture, while at the same time having no intention of following through on the many representations Smith made to Kearney USA. These representations were made by *Smith*, and caused injury to Kearney USA in Massachusetts; it is therefore just that Smith answer for his conduct in Massachusetts.

(c)      Smith's motion is at bottom premised on a dispute resolution provision between non-party Hartage Smith Nonwovens, LLC ("Hartage Nonwovens") and Kearney USA which provides for mediation before suit. However, while Smith cites to the dispute resolution provision, describing Hartage Nonwovens as "Smith's business" and the sales agreement, which was never honored by Hartage Nonwovens, as the reason to stay this litigation so that the condition precedent—mediation—can occur, Smith does not inform this Court that Smith has waived or breached the provision. In response to the Massachusetts lawsuit, rather than request mediation, Smith *added* Kearney USA as a defendant to litigation in Alabama,[2] which suit had been pending for over a year.[3] By this conduct Smith waived the provision. Like the rest of Smith's case, Smith would like it both ways- the provision is controlling enough to stay this lawsuit – but not sufficient to require him to comply with it by submitting to mediation *before* litigation is commenced. Indeed, Smith further undermines his own argument that the dispute provision is controlling by arguing at length that this Court should stay this suit for purposes of judicial economy - in favor of the Alabama suit – a point that would not even be relevant if the

---

[2]      Smith also added the individuals Ken Kearney and Paul Miller, although no effort has been made to serve either one. Neither is a party to any contract with Smith.

[3]      Smith's papers admit that Kearney USA is not a party to the joint venture agreement which was to operate the entity known as Nonwoven Industries (USA) LLC ("NWI USA") and was not a party in the dispute being litigated in Alabama. See Def.'s Mem. at pp. 2-3.

2

parties were required *first* to mediate this dispute.

In short, Smith's actions are simply belated efforts to eschew this Court's proper jurisdiction. Until Kearney USA brought this litigation, Smith never considered Kearney USA as a necessary party to the Alabama litigation as witnessed by his failure to join Kearney USA for over a year. Smith's fraud has injured a corporation which resides in Massachusetts. It is proper for him to answer for such fraud in a Massachusetts court. For these reasons, Smith's motion should be denied.

## RELEVANT BACKGROUND

This action arises out of Smith's pattern of intentional, fraudulent conduct, which conduct was part of his scheme to gain the necessary funding and expertise for his new venture. Now having received Kearney USA's expertise and confidential information, Smith has reneged on his representations. Kearney USA is a Massachusetts-based company that specializes in the marketing and sale of nonwoven fabrics, with a particular expertise in the marketing and sale of spunbond polyester. Complaint ("Compl.") ¶ 4. Prior to 2002, Kearney USA had a business relationship with Nonwoven Industries SpA ("NWI"), an Italian corporation and a leading manufacturer of spunbond fabric in Italy, with expertise in the technology of manufacture, installation, assembly and operation of spunbond equipment and the construction of spunbond plants. Id. ¶ 5.

In 2002, Smith, through his company Hartge Smith Nonwovens LLC ("HSN"), purchased spunbond manufacturing equipment (the "Equipment") at a foreclosure sale in Cincinnati Ohio. Id. ¶ 7. Since HSN had little experience in the manufacture of spunbond fabrics, in May 2002 it contacted NWI to inquire as to whether NWI was interested in purchasing the equipment. Id. NWI declined, as HSN was offering to sell the equipment for more than ten times its purchase price. Id. ¶ 8. Smith then told NWI that, while other companies

3

worldwide were interested in purchasing the equipment, HSN was willing to enter into a joint venture with NWI, in which HSN would contribute the Equipment and NWI would contribute cash and manufacturing expertise.  Id.

In February of 2003, while HSN and NWI were still working on the parameters of a joint venture relationship, the principal of NWI, Roberto Baroni ("Baroni") approached Kearney USA about the joint venture, and introduced Kearney USA to Smith and HSN for the purpose of providing marketing, sales and cost expertise in the domestic United States market.  Id. ¶ 9.  Not long after Kearney USA's introduction to Smith, in April 2003, Smith formed an entity called Nonwovens Industries (USA) L.L.C. ("NWI-USA") which was to be the vehicle for the joint venture between HSN and NWI.  Id. ¶ 10.  NWI-USA was to be presented to the industry as a sister company to NWI, thus enabling NWI-USA to capitalize on the goodwill and reputation of NWI and to piggyback onto Kearney USA's prior marketing efforts for NWI in the United States.  In July/August, 2003, Smith and Baroni formalized their relationship, executing a joint venture agreement.  To this day, however, Smith admits that HSN has not transferred the Equipment to NWI USA.  Id.

Despite the fact that Smith had no intention of actually transferring the Equipment to NWI-USA, Smith approached Kearney USA directly and represented that NWI-USA had been formed and had been capitalized.  Id. ¶ 11.  In a series of meetings and conversations with Kearney USA's principals, Messrs. Kenneth Kearney and Paul Miller, Smith also represented to Kearney USA that:

- the Equipment had been improved with a "scrap recycling process";
- the Equipment was presently capable of manufacturing flat bond fabrics;
- the Equipment had been tested before HSN purchased it and that it was operational;
- the Equipment had been "shaken down", that there were "no leaks" and that the Equipment was operational;

4

- Smith had assembled a team that possessed the necessary know- how and technical expertise to operate the Equipment and produce flat bond;
- the Equipment, while purchased by HSN, would be owned by NWI-USA;
- Kearney USA would be the exclusive distributor and broker for NWI-USA's products;
- In exchange for providing its sales and marketing expertise, NWI-USA would be divided into two divisions; an Operational Division, with Class A voting shares, and a Trading Division, with Class B shares;
- Kearney USA would from the outset receive and would be granted 20% of the Class B shares, with a right within two and a half years to acquire a 20% interest in the Class A shares at a price of $3,000,000, based upon the forecasted value of the joint venture at that time;
- Smith would cause NWI to enter into a Sales and Marketing Agreement to document Kearney USA's rights;
- Smith considered the relationship with Kearney USA to be of "high importance", that "we are moving forward" and that any delay was simply making sure the "i's are dotted and the t's crossed;" and
- Smith repeatedly referred to Kearney USA as his partner.

Id.  Contemporaneously with these representations, Smith was requesting information from Kearney USA regarding the market, sales, customers, and forecasts for expected sales of the joint venture, which Smith assured Kearney would be treated as confidential and proprietary information of Kearney USA.  Id. ¶ 12.

Based on these representations, Kearney USA went forward with its relationship with Smith, and, as of September 17, 2003, entered into a Sales and Marketing Agreement ("the Agreement") with NWI and HSN.  Id. ¶ 14.  Neither Smith individually, nor NWI-USA, signed the Agreement; rather the signatory was HSN, signed by Smith only in his capacity as "Chairman" of HSN.  See Def's Memorandum in Support of Motion to Stay Litigation ("Def.'s Mem.") at Tab A.  The Agreement confirmed Smith's prior representation that Kearney USA had a twenty percent (20%) interest in NWI-USA's Class B Units ("Kearney USA Interest") and that Kearney USA would manage the performance of NWI-USA's Trading Division and direct the sales and marketing efforts.  Id.

Additionally, based upon Smith's representations Kearney USA stopped pursuing other valuable opportunities to bring competing products into the United States market and continued to provide Smith with its valuable confidential information, including information regarding is customers, marketing plans and industry forecasts. Compl. ¶ 15. Further, at Smith's request and in reliance on Smith's representations, Kearney USA began to create a market for NWI-USA's products, including putting together operating budgets and forecasts for NWI-USA, setting up a website and a dedicated 800 # for NWI-USA, and hiring an independent contractor to work solely on the new marketing venture. Id. Kearney further gave Smith immediate access to its customers, provided Smith access to a manufacturing expert in the field of flat bond, and began actively soliciting customers on NWI-USA's behalf. Id. ¶ 16. In fact, in October 2003 Kearney USA brought one of its top customers to Alabama to meet directly with NWI-USA and Smith. Id.

In early December 2003 at a meeting in Boston between Smith, NWI and Kearney USA, Smith continued to act as if the venture was going forward, drumming up excitement over NWI-USA and representing that "they were going to make millions" together and reiterating their partnership. Id. ¶ 17. At no time during the meeting, however, did Smith reveal what he had long planned to do—namely claim that NWI had breached the joint venture agreement with HSN and that accordingly the joint venture was at an end. Smith's plan is revealed in that he never caused HSN to actually transfer title of the critical Equipment to the joint venture. Id. ¶ 18. Thus, once Smith received the necessary information to permit Smith to operate, contrary to this representations to Kearney USA, he was "free" to operate the Equipment outside of the venture.

On December 9, 2003, just days after coming to Boston to plan the future of NWI-USA, Smith filed suit in Alabama against NWI *only*, alleging that NWI failed to make over a million

dollars in required contributions to NWI-USA ("NWI Suit").  Id. ¶ 19.  The NWI-Suit, seeks, among other remedies, a declaration that the joint venture agreement between HSN and NWI is null and void.  Id.

In December 2004, a full year after the NWI Suit was filed and *solely* in response to this lawsuit being filed and served, Smith moved to add Kearney USA (and its principals Paul Miller and Kenneth Kearney) as parties to the NWI Suit.  Kearney USA was purportedly served just weeks ago, on or about January 19, 2005, with a summons and complaint in the NWI Suit.[4]  See NWI Suit Amended Complaint, a true and accurate copy of which is attached hereto as Exhibit 1.

Once Smith filed the NWI suit on behalf of HSN, Smith terminated Kearney USA's relationship with NWI-USA.[5]  Compl. ¶ 21.  All the while, however, Smith has used, and continues to use, Kearney USA's marketing and sales information, as well as NWI's funds, in an effort to appropriate the Equipment and the business for himself.  Id. ¶ 23.  Smith's conduct shows that Smith was engaged in a fraudulent scheme to obtain funding and information under false pretenses, in order to take the business opportunity for himself.[6]

---

[4]    As stated above, neither Mr. Miller nor Mr. Kearney have been served.

[5]    According to Smith, NWI-USA has no assets and is for all intents and purposes defunct.  .  See Smith's October 21, 2004 Affidavit at ¶ 11, a true and accurate copy of which is attached hereto as Exhibit 2.

[6]    Kearney USA objects to the Affidavit Smith filed in support of his motion to stay.  The objection is multiple.  First, since Smith is asking this Court to consider the nature of Kearney USA's claims, it should do so on the face of the Complaint, accepting the allegations as true.  See Fed. R. Civ. P. 12(b).  The vehicle for testing the allegations is through a properly briefed summary judgment motion, not a motion to transfer.  Second, the subject matter of Smith's Affidavit is objectionable on its face in that it purports to relate a confidential mediation and a settlement discussion with NWI.  Smith actually attaches the settlement agreement between NWI and HSN as an exhibit to the motion to stay, which settlement agreement was the product of mediation in Alabama.  It is apparent that Smith has no regard for any representation where ignoring it will serve his own personal purposes.  Kearney USA will not dignify these improper statements with a response except to note that Kearney USA was not a party to the mediation or settlement discussions because it was not a party to the Alabama litigation and no one considered it necessary to join Kearney USA.  In the event that notwithstanding these objections, this Court considers Smith's Affidavit at all, Kearney USA requests an opportunity to contest Smith's assertions via affidavits of its own.

**ARGUMENT**

**I.    THIS COURT IS THE PROPER FORUM FOR THIS LITIGATION AND THE DEFENDANT HAS NOT PUT FORTH ANY REASONS WHICH WOULD JUSTIFY A STAY.**

    **A.    Standard.**

    While federal courts have an inherent power "to control the disposition of the cases on its docket," Landis v. North Am. Co., 229 U.S. 248, 254 (1936), they also have a "strict duty to exercise the jurisdiction that is conferred upon them by Congress."  Goldhammer v. Dunkin Donuts, Inc., 59 F. Supp. 2d 248, 251 (D. Mass. 1999) quoting Quakenbush v. Allstate Ins. Co., 517 U.S. 706, 716, 135 L. Ed. 2d 765 (1983).  In light of this "virtually unflagging obligation of the federal courts to exercise the jurisdiction given to them," federal courts will only decline jurisdiction in the case of "exceptional circumstances."  Goldhammer, 59 F. Supp. 2d at 251.  Since "a stay is as much a refusal to exercise federal jurisdiction as a dismissal," the same "exceptional circumstances" test applies.  Id. at 252.  In this case, Smith has put forth no reasons, and certainly no exceptional reasons, which would justify a stay.

    **B.    Smith Is Liable for his Fraudulent Conduct, Which Conduct Was Directed to and Caused Injury to, Kearney USA in Massachusetts.**

    This Court is the proper forum for Smith to answer for his fraudulent conduct because Smith made and directed his misrepresentations to Kearney USA in Massachusetts, which misrepresentations caused injury to Kearney USA in Massachusetts, as its principal place of business is located here.  Such allegations are sufficient to require Smith to answer for his misdeeds in a Massachusetts court.  See Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 664 (1st Cir. 1972) ("[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state.").  Kearney USA is located in Massachusetts as are Mr.

Kearney and Mr. Miller, its witnesses. Indeed, Smith does not contest that Kearney USA's claims have a strong nexus with Massachusetts.

As set forth above, Smith admits that the Equipment which was to be the purpose of the joint venture and to capitalize NWI-USA, has never been transferred to NWI-USA. See Exhibit 2, Smith's October 21, 2004 Affidavit at ¶ 11 ("The equipment is still owned by HSN; it has not been transferred to the Joint Venture or anyone else and remains unencumbered."). Thus Smith, never made NWI-USA anything more than a fiction and Smith's statements to Kearney USA are intentional misrepresentations. Smith is personally liable for those misrepresentations because case law is clear that an individual, whether or not an officer or director of a corporation, who participates directly in tortious conduct is personally liable for such. See Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 938 (1st Cir. 1985). Moreover, Smith is personally liable for his misdeeds and misrepresentations that preceded NWI-USA as a promoter of NWI-USA. See generally Old Dominion Copper Mining and Smelting Co. v. Bigelow, 203 Mass. 159, 178 (1909); Hayward v. Leeson, 176 Mass. 310, 319-321 (1900). Therefore, it is clear that Kearney USA has alleged sufficient claims of fraud against Smith individually, which claims are properly brought in this jurisdiction.

### C. Smith Cannot Require Kearney USA to Comply with Dispute Resolution Provisions to an Agreement Where He Is Not a Party.

Smith's attempt to rely on the dispute resolution provision of the sales and marketing Agreement - an agreement to which he is not even a party - is unavailing, because "it is settled beyond peradventure that a person signing a contract only in a corporate capacity, and unambiguously indicating that fact on the face of the contract documents, does not thereby become a party to the agreement. McCarthy v. Azure, 22 F.3d 351, 356 (1st Cir. 1994). In McCarthy, the First Circuit held that the defendant, who signed an agreement on behalf of his

corporation and in his corporate capacity, could not compel the plaintiff to arbitrate its claims against him individually.  Id. at 363.  In reaching this conclusion, the court started with the premise that "as a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so."  Id. quoting Painewebber, Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990).  The court then reasoned that the defendant's signature as "chairman" of his company (as Smith signed as "chairman" of HSN) was evidence that the parties did not intend to commit to arbitration claims against the defendant individually.  Id. at 356.  The court further dismissed the defendant's arguments based upon theories of agency and the scope o the arbitration clause, finding that the plaintiff would not have been able to compel the defendant, individually, to arbitration and further that the scope of the arbitration provision was narrow, further evidencing the parties' intent not to have the subject claims arbitrated.  Id. at 357-359.

In this case, Smith signed the Agreement solely in his capacity as chairman of HSN; he is therefore not a party to the Agreement and thus cannot seek to abdicate this Court's jurisdiction based upon it.  Id.; see also Computer Corp. of America v. Zaecor, 16 Mass. App. Ct. 456, 460 (1983) (defendant who signed contract as president of corporation was not a party to the contract and therefore could not compel plaintiff to arbitrate its claims).  Smith supplies no rationale why HSN is the only signatory in an Agreement purportedly made between NWI-USA, NWI and Kearney USA, but, as proffered by Smith, without NWI-USA as an executing party despite NWI-USA's purported corporate existence at the time the Agreement was executed.  The only questions the signatures raise is as to the depth of Smith's fraud in the shell game he was playing.  Thus, Kearney USA's has properly found the "pea" in suing Smith individually for fraud and Smith should not be permitted to hide behind a contractual provision between HSN and Kearney USA.

Further, in this case, as was the case in <u>McCarthy</u>, the dispute resolution provision is narrow (only disputes "arising from" the subject matter of the agreement), a further indication that the parties did not intend a broad reading of the provision. See <u>McCarthy</u>, 22 F.3d at 351 (finding language that disputes "arising under" the agreement was narrow in scope); <u>accord</u> <u>Minera Alumbrera Ltd. v. Fluor Daniel, Inc.</u>, No. 98 CIV 5673, 1999 U.S. Dist. LEXIS 6368 at *17 (S.D.N.Y. May 4, 1999) (court denied defendant's motion to compel arbitration because defendant was not a signatory to the agreement and the dispute provision was narrow in scope, only covering disputes "arising from" and/or "arising under" the contract). Therefore, as in <u>McCarthy</u> and <u>Minera</u>, since Smith individually is not a party to the Agreement, he cannot attempt to circumvent this Court's proper jurisdiction by invoking the provisions of it. See <u>Id.</u>

**D.      Even if the Dispute Resolution Provision of the Agreement Were Applicable to this Dispute – which Kearney USA Denies – Smith Is in Breach of the Provision and Thus Cannot Rely on It to Stay this Litigation.**

The dispute provision upon which Smith relies to stay this case requires that "any dispute…between the Parties shall be submitted to non-binding mediation…". See Def.'s Mem. at Tab A. While Kearney USA denies that such a provision is applicable to Smith individually, see § C <u>supra</u>, even if it were applicable, Smith has waived and/or is in breach of the provision and therefore cannot rely on it to stay this case. See <u>HIM Portland, LLC v. Devito Builders, Inc.</u>, 317 F.3d 41, 42 (1st Cir. 2003). In December 2004 and only after being served with this lawsuit, Smith sought leave to add Kearney USA to the NWI Suit, which suit had been pending in Alabama between HSN and NWI. Once leave was granted, on or about January 19, 2005, Smith had Kearney USA served with an amended complaint in the NWI Suit. See Exhibit <u>1</u>. Obviously, Smith's adding Kearney USA to the NWI Suit is not in compliance with the dispute provision, which requires mediation prior to any suit being filed. See Def.'s Mem. at <u>Tab A</u>. Therefore, Smith's own failure to comply with provision, even if it was controlling between the

parties, is a waiver of its applicability and Smith cannot be allowed to use such a provision as a basis for a stay of this litigation when he himself is has not complied with it.  See HIM Portland LLC, 317 F.3d at 42 (where neither party attempted to mediate dispute, which mediation was a condition precedent to arbitration, neither could be compelled to arbitration).

Interestingly, Smith actually argues that Kearney USA cannot bring this suit because "[m]ediation is a condition precedent to litigation between the parties as set forth in plaint language of the S&M Agreement.  [Kearney USA] has not met the condition precedent because it has failed to mediate this case." (Def.'s Mem. at p. 11-12)  However, Smith apparently feels such a condition precedent is not applicable to HSN (the party who actually signed the Agreement with Kearney USA), because HSN filed suit and served Kearney USA in Alabama, without ever requesting, never mind actually mediating, its dispute with Kearney USA prior to filing the lawsuit.  In fact to the contrary, it is Kearney USA who has proposed mediation in this lawsuit – a proposal to which Smith has yet to respond.  Therefore, in light of his own failure to comply with the dispute provision, Smith cannot seek to hold Kearney USA to such a provision.

Moreover, Smith cannot argue that he is requesting a stay to initiate mediation as the provision requires, because his brief clearly requests a stay "pending the resolution of the Alabama litigation" – and only if the Alabama litigation does not resolve Kearney USA's claims, then Smith asks for a further stay for mediation.  Def.'s Mem. at p. 12.  Smith's own request for relief from this Court is directly contrary to the dispute provision in the Agreement – it is disingenuous at best for him to argue that this Court must stay this litigation because Kearney USA did not comply with the Agreement.

**E.     This Litigation Should Not Be Stayed for the Alabama Litigation Because the Factors Which a Court Considers Weigh in Favor of Retaining Jurisdiction.**

When there are two federal litigations involving the same parties, a federal court, in determining venue, will look to the following factors: (1) the order in which jurisdiction was obtained; (2) the convenience of the witnesses and the parties; and (3) the availability of documents and the possibilities of consolidation.  Cianbro Corp. v. Curran-Lavoie, Inc., 814 F. 2d 7, 11 (1st Cir. 1987).  Where the actions entail duplicative litigation, "the first-filed action is generally preferred in a choice of venue decision."  Id.  Moreover, there is a "strong presumption in favor of the plaintiff's forum choice, against which the defendant must bear the burden of proving that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum."  GSI Lumonics, Inc. v. Biodiscovery, Inc., 112 F. Supp. 2d 99, 104 (D. Mass. 2000).  In this case, the applicable factors weigh in favor of this Court retaining jurisdiction.

Kearney USA brought this litigation in Massachusetts in order to obtain efficient, effective relief against Smith for his fraudulent misrepresentations.  Kearney USA is based solely in Massachusetts, and all of its witnesses and documents are located in Massachusetts. Therefore, as to Kearney USA, this Court is the more convenient forum.  While Kearney USA does not dispute that Alabama is more convenient for Smith, since Smith directed his misrepresentations to a Massachusetts-based entity, he should be required to answer for his conduct here.  See Murphy, 460 F.2d at 664.

Further, Kearney USA filed and served this lawsuit prior to Smith moving to add Kearney USA as a party to the NWI Suit, and thus as to Kearney USA and Smith, this suit was filed first – a presumption which favors the retention of the case.  See GSI Lumonics, Inc. v. Biodiscovery, Inc., 112 F. Supp. 2d at 104 (D. Mass. 2000) (stating "the filed first action is

generally preferred in a choice –venue-decision," noting that there is a "strong presumption in favor of a plaintiff's forum choice…").  While Smith argues that the NWI Suit has been pending for over a year, it has only been pending against Kearney USA for less than three weeks; moreover, the current status of the NWI Suit is that NWI moved for a preliminary injunction seeking protection of its investment in the joint venture, which injunction has been pending for almost a year and has not yet been decided.  Furthermore, no substantive discovery, other than issues relating to the injunction, has taken place.  Therefore, for all intents and purpose, the NWI Suit - as to all parties - is in its beginning stages and thus cannot be deemed an "exceptional circumstance" warranting dismissal.  See id.

Moreover, Kearney USA's claims are based upon Massachusetts state law, including a 93A claim, another factor which supports retaining jurisdiction d in a Massachusetts forum.  See Wellons v. Numerica Sav. Bank, FSB, 749 F. Supp. 336, 337 (D. Mass., 1990) (noting transfer was proper to district court in state where cause of action arose and which law would govern the dispute).  Finally, this Court should consider that in the Alabama litigation, NWI-USA, presumably at Smith's request, asserts substantive claims against Kearney USA to circumvent the jurisdiction of this Court.  Had the claims been real, they would have been asserted long before now.  The defects in the claims are shown by the nature of the allegations.[7]  In fact,

---

[7]    NWI-USA's claims against Kearney USA are for breach of fiduciary duty, tortious interference with contractual relations, interference with contract and prospective business advantage, and for a declaratory judgment.  See Exhibit 1.  None of these claims withstand scrutiny, however, as Smith only relies upon conduct of Kearney USA which occurred *after* Smith himself terminated the NWI-USA venture by causing NWI-USA to sue NWI for an alleged breach in December 2003 and a declaration that the venture with NWI was "null and void".  Smith stopped all relations with Kearney USA once he instituted suit against NWI; and therefore, Kearney USA's subsequent actions are of no relevance.  Moreover, NWI-USA alleges that Kearney USA tortiously interfered with its settlement negotiations with NWI because Kearney USA refused to sign a release requiring Kearney USA to give up all claims –despite the fact that Kearney USA did not participate in the mediation and the settlement did not include any consideration whatsoever to Kearney USA.  How Kearney USA's refusal to sign a release, for which it was offered no consideration, can be tortious conduct is mysterious indeed.

because such claims are deficient, Kearney USA intends to move to dismiss all claims against it in the NWI Suit- which motion, if allowed, would render this analysis moot.

Finally, despite Smith's attempt to portray this suit as Kearney USA's way to "gain leverage and a financial settlement in the Alabama litigation," nothing could be farther from the truth.  The fact is that Smith, as a condition to settling the NWI Suit with NWI, wanted a release from Kearney USA.  Smith, however, refused to offer Kearney USA *any* consideration for the release; which refusal was, from Kearney USA's perspective, done in bad faith, as Smith obviously thought he could be liable to Kearney USA, or a release would not have been necessary.  Unable to extort a release from Kearney USA in return for nothing, Smith now attempts to argue that the fact that Kearney USA was forced to sue Smith is somehow "vexatious and reactive" conduct by Kearney USA.  Def.'s Mem. at p. 8.  Such allegations are clearly without merit; Kearney USA sued Smith because Smith made fraudulent representations to Kearney USA, which misrepresentations caused injury to Kearney USA.  If these claims were without merit, as Smith claims, why would Smith need a release from Kearney USA, and more importantly, why would Smith have walked away from his settlement with NWI solely based upon Kearney USA's failure to provide the release (since, if Kearney USA did not have any valid claims against Smith, a release would not have been necessary)?  The answer is clear – Smith needs a release because Smith is aware of his fraudulent conduct.  Therefore, if any parties' conduct it to be considered by this Court, it should be Smith's conduct in demanding a full release from Kearney USA in exchange for nothing.

## II.    CONCLUSION

WHEREFORE, for the reasons set forth herein, Kearney USA respectfully requests that this Court deny defendant's Motion to Stay Litigation and for any other and further relief as this Court deems just and proper.

Respectfully submitted,

J. KENNETH KEARNEY USA LTD.
By its attorneys,


_____/s/ Kristin M. Cataldo_____
William A. Zucker, BBO # 541240
wzucker@ghlaw.com
Kristin M. Cataldo, BBO # 654033
kcataldo@ghlaw.com
Gadsby Hannah LLP
225 Franklin Street
Boston, MA  02110
(617) 345-7000


February 7, 2005

### Certificate of Service

I hereby certify that on February 7, 2005 I served a true and accurate copy of Plaintiff's Opposition to Defendant's Motion to Stay Litigation upon all counsel of record electronically.

Dated:  February 7, 2005                     /s/ Kristin M. Cataldo_____
                                             Kristin M. Cataldo

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| J. KENNETH KEARNEY USA LTD., ) | |
| Plaintiff, ) | CIVIL ACTION |
| v. ) | NO.  04 CV 12643 RCL |
| DAVID SMITH, ) | |
| Defendant. ) | |

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY
LITIGATION**</u>

**EXHIBIT 1**

AO 440 (Rev. 10/93) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

SOUTHERN _____ District of ___ ALABAMA ___

NONWOVEN INDUSTRIES (USA)

V.

NONWOVEN INDUSTRIES, SpA

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:  03-0840-CB-C

TO: (Name and address of Defendant)

Paul Miller
c/o J. Kenneth Kearney, Ltd.
111 Speen Street, Suite 423
Boston, MA 01701

**YOU ARE HEREBY SUMMONED** and req

ORRIN K. AMES, III
HAND ARENDALL, LLC
POST OFFICE BOX 123
MOBILE, AL 36601

an answer to the complaint which is herewith served upon you,                    is
summons upon you, exclusive of the day of service. If you fail            u for
the relief demanded in the complaint.  You must also file your            able
period of time after service.

**CHARLES R. DIARD, JR.**                            JAN 0 3 2005

CLERK                                                 DATE

*Cathi M. Jennings*

(By) DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NONWOVEN INDUSTRIES (U.S.A.),　　　　)
L.L.C. and HARTGE SMITH　　　　　　　　)
NONWOVENS, L.L.C.,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　　　)　　CIVIL ACTION 03-0840-CB-C
　　　　　　　　　　　　　　　　　　　　　　)
NONWOVENS INDUSTRIES SpA;　　　　　　)
J. KENNETH KEARNEY, LTD., a New　　　　)
York Corporation d/b/a J. KENNETH　　　　)
KEARNEY, USA, LTD.; J KENNETH　　　　　)
KEARNEY; PAUL MILLER,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　　　　　　)

## AMENDED COMPLAINT

　　　Nonwoven Industries (USA), L.L.C. and Hartge Smith Nonwovens, L.L.C. hereby amend their previously filed complaint to add additional defendants and claims.

### Jurisdiction

1.　　　Plaintiff Nonwoven Industries (USA), L.L.C. (hereafter "NWI-USA") is a limited liability company organized under the laws of the State of Alabama with its principal place of business in Alabama.

2.　　　Plaintiff Hartge Smith Nonwovens, L.L.C. (hereafter "HSN") is a limited liability company organized under the laws of Ohio with its present principal place of business in Alabama.

3.　　　Defendant Nonwoven Industries SpA (hereafter "NWI") is an Italian corporation with its principal place of business in Italy.

4. J. Kenneth Kearney, Ltd. (JKK) is a New York corporation doing business in Massachusetts and sometimes does business as "J. Kenneth Kearney, USA, Ltd."

5. J. Kenneth Kearney is a principal in JKK and is a vice-president of NWI-USA.

6. Paul Miller is a principal in JKK and is a vice-president of NWI-USA.

7. There is complete diversity of citizenship between the Plaintiffs on the one hand and all of the Defendants, on the other hand.

8. The amount in controversy exceeds $75,000.00.

9. This Court has jurisdiction over this matter under 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the plaintiffs and the defendants and the amount in controversy exceeds $75,000.00.

10. Effective August 21, 2003, the Plaintiff HSN and the Defendant NWI entered into a Joint Venture Agreement (the Agreement). The Plaintiff NWI-USA was organized for the purpose of serving as the operating entity contemplated by the Agreement and the Joint Venture.

11. Pursuant to paragraph 2 of the Agreement, NWI was required to deposit into NWI-USA's account the sum of $3,271,000.00 as the initial capitalization of NWI-USA no later than September 30, 2003.

12. NWI-USA and JKK entered into a Sales and Marketing Agreement ("S&M Agreement") effective September 17, 2003. The Sales and Marketing Agreement executed by JKK was signed by Paul Miller, vice-president of JKK.

13. The S&M Agreement, among other things, provided the following:

    (a)    That JKK would be admitted to NWI-USA as a member as of September 17, 2004, with a twenty (20%) percent interest of Class B stock in NWI-USA; and

- 2 -

(b)     That JKK's relationship to NWI-USA and NWI would be that of a member of NWI-USA;

(c)     That JKK would manage the performance of NWI-USA's trading division;

(d)     That the S&M Agreement would continue until the occurrence of any of the following events:

    (i)     The mutual agreement of the parties;

    (ii)     The insolvency, appointment, or receiver, filing of bankruptcy, or cessation of business in the ordinary course of business of any of the parties;

    (iii)     The exercise of an option by JKK to acquire certain Class A membership interests;

    (iv)     That the Agreement would govern, in part, the conduct, rights and privileges of the parties to the S&M Agreement

    (v)     The Agreement provided that NWI-USA was to be managed by a board of directors and the company's duly appointed officers which included J. Kenneth Kearney and Paul Miller as vice-presidents of NWI-USA.

14.     On June 30, 2004, JKK and/or its principals, J. Kenneth Kearney and Paul Miller, formed "NWI America, L.L.C." ("NWI America") as a Massachusetts limited liability company. According to NWI America's Certificate of Organization filed with the Massachusetts Secretary of the Commonwealth, NWI America's address is the same as the address for JKK, its registered agent is Paul Miller, and a person authorized to execute documents on behalf of NWI America is J. Kenneth Kearney.

15.     NIW America's Certificate of Organization states that "the general character of the business of the LLC is to manufacture and sell high quality polyester spunbond and related

products and to conduct research and development activities relating to spunbond in alternative markets ...."

16.     On or about May 3, 2004, NWI, through its president, Roberto Baroni, NWI-USA, through its principals, David Smith and Perry Hartge, HSN through its principals, David Smith and Perry Hartge, and David Smith, individually, entered into a settlement agreement after the pending litigation had been mediated.  A condition precedent to the binding nature of that settlement agreement was that a release would be obtained from JKK.

**Count One**
**(Breach of Contract)**

17.     The Plaintiff adopts paragraphs 1 through 16 above and incorporates them by reference herein.

18.     NWI has breached the Agreement with the Plaintiff HSN by failing to pay the $3,271,000.00.  Of the amount required, a total of only approximately $2,416,530.50 has been paid, and that was not paid on a timely basis.

WHEREFORE, Plaintiff HSN demands judgment against NWI for the amount remaining to be paid under the Agreement, plus consequential damages, interest, and costs.

**Count Two**
**(Third-Party Beneficiary)**

19.     The Plaintiffs adopt paragraphs 1 through 16 above and incorporates them by reference herein.

20.     Plaintiff NWI-USA was the intended third-party beneficiary of the Joint Venture Agreement entered into which is attached as Exh        d incorporated herein by reference.

21.    As a result of NWI's failure to provide the necessary capitalization for NWI-USA, NWI-USA is undercapitalized and does not have the necessary funds to complete its startup operations and begin production.

22.    Plaintiff NWI-USA has been damaged as a result.

WHEREFORE, Plaintiff NWI-USA demands judgment against NWI for the amount to be paid under the Agreement plus consequential damages, interest and costs.

## Count Three
### (Breach of Fiduciary Duty)

23.    Plaintiffs adopt and incorporate by reference paragraphs 1 through 16 as if set out fully herein.

24.    JKK, J. Kenneth Kearny, and Paul Miller, separately and jointly, knowingly and purposely or negligently breached their fiduciary duties to the Plaintiffs, separately and jointly, as follows:

(a)    In January 2004, spunbond that had been ordered by NWI-USA from NWI-SpA was redirected by NWI and JKK to JKK's control in a warehouse in South Carolina, without consultation with, or the consent of HWS-USA, thus diverting NWI-USA's product;

(b)    In May 2004, JKK attended an IDEA '04 Convention with NWI using NWI-USA's funds to do so;

(c)    On or before June 7, 2004, JKK represented in its website that it was "a partner with a leading European North American manufacturer" of spunbond polyester. The alleged partner with which JKK had partnered was not NWI-USA and, therefore, JKK, J. Kenneth Kearney and Paul Miller, while owing fiduciary duties to NWI-USA, were in partnership with the company competing with NWI-USA.

(d)    On June 30, 2004, JKK and/or it s principals, J. Kenneth Kearney and Paul Miller, formed "NWI America, L.L.C." ("NWI America") as a Massachusetts limited liability company. According to NWI America's Certificate of Organization filed with the Massachusetts Secretary of the Commonwealth, NWI America's address is the same as the address for JKK, its registered agent is Paul Miller, and a person authorized to execute documents on behalf of NWI America is J. Kenneth Kearney. NIW America's Certificate of Organization states that "the general character of the business of the LLC is to manufacture and sell high quality polyester spunbond and related products and to conduct research and development activities relating to spunbond in alternative markets ...." Thus JKK, J. Kenneth Kearney and Paul Miller while owing fiduciary duties to NWI-USA formed a company to compete directly with NWI-USA.

(e)    On July 1, 2004, knowing that NWI-USA and NWI had entered into a settlement agreement, JKK sent a demand letter falsely asserting that it had suffered harm from Mr. Smith's and NWI-USA's alleged failure to fulfill their obligations under the Sales and Marketing Agreement and, without any legitimate basis, demanded that all confidential information provided to it by NWI-USA be treated confidential, that NWI-USA enter into a three year non-compete agreement to be effective anywhere in North America, and monetary damages of $1.25 million. These demands were made without legitimate factual bases while knowing full well that they would adversely affect the settlement between NWI-USA and NWI. In fact, the settlement desired and negotiated between NWI-USA and NWI has now broken down and the parties have not been able to settle as a direct result of JKK's, J. Kenneth Kearney's, and Paul Miller's above described actions which were taken in spite of their fiduciary duties that they owed to NWI-USA.

- 6 -

WHEREFORE, NWI-USA demands judgment against JKK, J. Kenneth Kearney, and

Paul Miller, separately and jointly in the amount of $1,000,000.00.

## Count Four
### (Tortious Interference with Contract and Prospective Business Relationships)

25.     NWI-USA adopts and incorporates by reference paragraphs 1 through 16 and 23 through

24, and restates them as fully stated herein.

26.     The actions of J. Kenneth Kearny, Paul Miller, and JKK, separately and jointly,

tortuously interfered with the contractual settlement arrangements between NWI-USA and NWI

thereby resulting in the loss of the settlement opportunity and agreement.

WHEREFORE, NWI-USA demands judgment in the amount of $1,000,000.00 against

JKK, J. Kenneth Kearncy, and Paul Miller, separately and jointly.

## Count Five
### (Interference with Contract and Prospective Business Advantage)

27.     NWI-USA adopts and incorporates by reference paragraphs 1 through 11 and 23 through

26, and restates them as if fully stated herein.

28.     NWI-USA had received a letter from Freudenberg, its primary customer to the effect that

Freudenberg would purchase material produced by NWI-USA.

29.     The actions of J. Kenneth Kearney, Paul Miller, and JKK, separately and jointly, their

forming of NWI-America as an entity to compete directly against NWI-USA, and their actions of

negotiating with Freudenberg while having fiduciary duties to NWI-USA tortuously interfered

with NWI-USA's contractual, prospective contractual, and prospective business relations with

Freudenberg.

WHEREFORE, NWI-USA demands judgment in the amount of $1,000,000.00.

- 7 -

## Count Six
### (Declaratory Judgment)

30.    Plaintiffs incorporate paragraphs 1 through 29 as if fully set out herein.

31.    Pursuant to the Agreement, NWI was required to deposit into NWI-USA's account the sum of $3,271,000.00 no later than September 30, 2003, which it has failed to do. In return for that promise and other considerations, NWI was to receive a fifty (55%) percent ownership interest in NWI-USA.

32.    Defendant NWI's payments totaling $2,416,530.50 have been properly used by NWI-USA to pay creditors and have, otherwise, been properly applied to the business as contemplated by the Agreement.

33.    As a result of NWI's breach of its various obligations and its conduct in this situation, the trust necessary for the parties to continue to do business as joint venturers with fiduciary obligations that attend such a relationship no longer exists and it has become impossible for HSN to continue to work with NWI and the Joint Venture has now failed of its essential purpose.

34.    By the actions of JKK, J. Kenneth Kearney, and Paul Miller, JKK has repudiated the Sales and Marketing Agreement by establishing a competing company and advertising its partnership with what it represented was a "leading ... North American manufacturer."

WHEREFORE, the Plaintiffs request that this Court exercise its equitable powers and to do the following:

(a)    To declare NWI to be in breach of its obligations to HSN and NWI-USA and to declare the rights and entitlements of the parties pursuant to the Joint Venture Agreement to include, but not to be limited to, that the money to be deposited by NWI-USA and

- 8 -

applied by NWI-USA have been properly applied and that the Joint Venture Agreement is null and void;

(b)    That the Sales and Marketing Agreement has been repudiated by JKK, J. Kenneth Kearney, and Paul Miller and/or that the Sales and Marketing Agreement has terminated pursuant to its terms and conditions and is, therefore, no longer in effect.


                                        s/Orrin K. Ames, III
                                        ORRIN K. AMES, III (AMESO3454)

OF COUNSEL:

HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, AL 36601
(251) 432-5511
FAX (251) 694-6375



                                        s/Gregory R. Jones
                                        GREGORY R. JONES (JONEG7172)

OF COUNSEL:

HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, AL 36601
(251) 432-5511
FAX (251) 694-6375

                                        Attorneys for Nonwoven Industries (USA), LLC,
                                        Hartge Smith Nonwovens, L.L.C., and
                                        David Smith

The defendants are to be served at the following addresses:

1.    NWI-SpA:
      Patricia Clotfelder, Esq.
      Counsel for NWI-NWI-SpA
      Baker, Donelson, Bearman,
       Caldwell & Berkowitz, P.C.
      420 20th Street North, Suite 1600
      Birmingham, AL 35203-5202

2.    <u>JKK</u>:
    a.    J. Kenneth Kearney, Ltd.
                111 Speen Street, Suite 423
                Boston, MA 01701

    b.    J. Kenneth Kearny, Ltd.
                c/o David Landon, C.P.A.
                12 Welch Avenue
                Stoughton, MA 02072

3.    <u>J. Kenneth Kearney</u>:
    a.    c/o J. Kenneth Kearney
                J. Kenneth Kearney, Ltd.
                111 Speen Street, Suite 423
                Boston, MA 01701

    b.    J. Kenneth Kearny
                c/o David Landon, C.P.A.
                12 Welch Avenue
                Stoughton, MA 02072

4.    <u>Paul Miller</u>:
    a.    Paul Miller
                c/o J. Kenneth Kearney, Ltd.
                111 Speen Street, Suite 423
                Boston, MA 01701

    b.    Paul Miller
                J. Kenneth Kearny, Ltd.
                c/o David Landon, C.P.A.
                12 Welch Avenue
                Stoughton, MA 02072

## CERTIFICATE OF SERVICE

I hereby certify that on the  0th day of December, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

<u>COUNSEL OF RECORD</u>:

PAT CLOTFELTER, ESQ.
ELLEN E. HENDERSON, ESQ.
CHRISTOPHER C. HAUG, ESQ.
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
420 North 20th Street, Suite 1600
Birmingham, AL 35203

W. CHRISTIAN HINES, III, ESQ.
JOHN PETER CROOK MCCALL, ESQ.
Starnes & Atchison LLP
Riverview Plaza, Suite 1106
63 South Royal Street
Mobile, AL 36602

I hereby also certify that I have mailed the foregoing to the following CM/ECF participants, by placing same in the United States Mail, properly addressed and first class postage prepaid:

NONE

s/Orrin K. Ames, III
ORRIN K. AMES, III

261868

- 11 -

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| J. KENNETH KEARNEY USA LTD.,       ) | |
| )                                   | |
| Plaintiff,       )                  | |
| )                                   | CIVIL ACTION |
| v.       )                          | NO.  04 CV 12643 RCL |
| )                                   | |
| DAVID SMITH,       )                | |
| )                                   | |
| Defendant.       )                  | |
| _____ ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STAY**
**LITIGATION**

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NONWOVEN INDUSTRIES (U.S.A.),<br>L.L.C. and HARTGE SMITH<br>NONWOVENS, L.L.C., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION 03-0840-CB-C |
| | ) | |
| NONWOVENS INDUSTRIES SpA, | ) | |
| | ) | |
| Defendants. | ) | |

<u>AFFIDAVIT OF DAVID SMITH</u>

1.     My name is David Smith. I am one of the principals involved in Hartge Smith Nonwovens LLC, and in Nonwoven Industries (USA), the Joint Venture. I am also a named Defendant.

2.     The purpose of this Affidavit is to provide the Court updating information since the date of the hearing on NWI SpA's Motion for a Preliminary Injunction.

3.     During, and at the conclusion of, that hearing, the Court expressed various concerns about the Italian companies' investment. It is hoped that this Affidavit will update the Court with respect to matters bearing on some, if not all, of the Court's concerns. It is hoped that these matters will demonstrate that the conditions and issues that gave rise to the Court's concerns are no longer issues.

4.     In summary:

(a)     The parties reached a mediation agreement in May whereby they would separate their business interests which settlement agreement was to be consummated in July;

(b)     Relying upon the mediation agreement, HSN and Smith completed over $2 million in final construction of the equipment and installation is now complete and the equipment is operational;

(c)     Construction was completed using inter alia, the original assembly team from Italy and the equipment produces 'spec' material for willing customers under new supply agreements;

(d)     HSN and Smith invested the funds that the joint venture was to have paid it as partial consideration for the equipment, into its construction.  HSN has therefore not been paid and title to the equipment remains unencumbered in HSN;

(e)     HSN and Smith have not used the purported NWI tradename or logo since prior to the last court hearing;

(f)     As a result of completing the construction, purchasing raw materials for production and general cash flow for operations moving forward, the company is in need of additional financing;

(g)     USA has a confidential funding offer which is contingent, among other things, on the resolution of the pending litigation with SpA. This funding offer would put equity into the business to meet its financial needs through 2006;

(h)     In addition to our substantial financial commitments to the company, Mr. Hartge and I have, since the date that this litigation commenced almost a year ago, actively worked on this project every day although neither of us has taken a pay check; and

(i)     Although we deny that the Italian companies have any proprietary interest in the customers and we deny that we ever received any information about the market to which we did not already have access, the Italian companies have now had over a year of uninterrupted time to secure customers and markets.

5.     At the time of the hearing, the equipment in question had not been assembled. It is my understanding that one of the concerns, as expressed by Ms. Clotfelter, counsel for the Italian companies, was that there was, at that time, no way for Mr. Baroni to know whether competent personnel were going to be used to assemble the equipment and, thereby, preserve the physical integrity of it. The equipment has now been fully assembled and tested. It is now ready to put into production. The personnel who were used to assemble the equipment were the same Italian crewmen who were working for the joint venture prior to the commencement of this litigation and who were the ones who the joint venture intended would assemble the equipment.

- 3 -

Therefore, any concerns about whether properly qualified personnel would assemble the equipment are now matters about which no one need have any concerns.

6.    The only thing presently holding up putting the equipment into production is the pending litigation. As the Court knows, efforts have been undertaken for some time to try to resolve this case. In fact at the conclusion of a mediation, the parties entered into a Mediation Agreement which set out the terms of a settlement. One of the conditions for the consummation of the settlement, however, was that a company called JKK, which was to have been the marketing arm of the Joint Venture, provide releases and be taken out of the picture so that the settlement could be effectuated.

7.    At the time of the mediation, Mr. Baroni indicated that it would not be a problem to obtain the release of JKK as they were prior to the formation of the joint venture, and continue to be as at the date of this affidavit, the sales and marketing arm for his Italian company. As a result of this representation and the overall mediation agreement, we moved forward to complete the installation of the machine and invested significantly in the project. Although the parties have worked diligently to try to resolve this matter with JKK, to date all of our efforts have proved futile. JKK is demanding that Mr. Hartge and I pay them $1.2 million and enter into agreements not to use purported trade secrets.

8.    I have to be frank with the Court and advise the Court that those demands of JKK will not be met by me. JKK's demands are unfounded. There are no protectable trade secrets. In fact, the matters about which JKK is apparently claiming secrecy are those very matters that were entered into the public record at our hearing. They are, therefore, a matter of public record and cannot, to anyone's conceivable imagination, now be argued to be any type of trade secret.

- 4 -



It is my position that they were not trade secrets to begin with, but even if they were, they certainly have lost that status as a result of that information being introduced in this Court without any protective order.

9.      Beyond that, my counsel have tried to determine from counsel for JKK the basis of JKK's monetary demand. The fact is that JKK has never made any financial contribution to the venture and my counsel have repeatedly asked counsel for JKK for details and components of the $1.2 million demand, but counsel for JKK has consistently refused to provide the needed details and information. Therefore, JKK has prohibited me and my counsel from even making an initial assessment of JKK's monetary demand. The result is that our company is effectively prevented from entering the market to compete with them.

10.     Having said that, we have potential funding to make a cash injection into the venture so that the equipment can be put into full production. However, that cash injection cannot be accomplished while the litigation issues are unresolved. Therefore, it is our hope that the issues can be resolved.

11.     The following are additional matters which I hope the Court will take into consideration:

(i)      The money that the Italian Companies paid, and that was a subject during the hearing, has been invested into the business. It has not been used to purchase the machine from HSN.



(ii)    The equipment is still owned by HSN; it has not been transferred to the Joint Venture or anyone else and remains unencumbered.

(iii)    The joint venture company has, as requested by Mr. Baroni, ceased using the name Nonwoven Industries (NWI).

(iv)    The joint venture company has ceased using the "NWI" logo.

(v)    The joint venture company has commitments for the sale of its goods.

(vi)    The joint venture company has obtained term sheets for both debt and equity funding, but cannot consummate these transactions as a result of JKK not providing releases as desired and required and the pending litigation.

(vii)    In addition to taking the money that was to have been paid to HSN for the equipment and putting it into the business, HSN and Smith have committed in excess of an additional $1 million of our personal resources to keep it going and to get the equipment to a point where it can be turned on and produce. However, without additional debt or equity, the company can no longer pay its bills as they come due.

(viii)    To date neither Mr. Hartge nor I have been paid any salaries; we have not been given the benefits that were promised through the joint venture; and we will have to provide additional personal guarantees for as much as $4.3 million in order to realize our investment.

12.    It has now been more than six months since the hearing. It is understood that the Court's concerns at that time revolved around whether the assets would be properly handled and

- 6 -

whether Mr. Baroni's investment would be protected. As described above, his investment has been protected, i.e., it has been put into the business which is in a posture where it can be put into production as soon as the litigation issues are resolved. Without the litigation issues being resolved, however, the necessary capital cannot be obtained and the equipment will remain unproductive in spite of the fact that it has full productive capabilities and could, in fact, increase the value of Mr. Baroni's investment.

I declare under penalty of perjury that the foregoing is true and correct.

_____
DAVID SMITH

STATE OF ALABAMA:

COUNTY OF MOBILE:

Sworn to and subscribed before me this 21 day of October, 2004.

_____
NOTARY PUBLIC
My Commission Expires: July 2, 2008

251031_1.doc